**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE RESEARCH FOUNDATION FOR THE STATE UNIVERSITY OF NEW YORK,<br><br>Plaintiff,<br><br>vs.<br><br>INPRIA CORPORATION and JSR CORPORATION,<br><br>Defendants. | Civil Action No. 1:24-cv-120-BKS-ML<br><br><br>**JURY TRIAL DEMANDED** |

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF SUNY RF's MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

Andrew R. Safranko, Esq.
LaMarche Safranko Law PLLC
Bar Roll 510803
987 New Loudon Road
Cohoes, New York 12047

Justin A. Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: 713-651-9366
Facsimile: 713-654-6666
jnelson@susmangodfrey.com

John Schiltz (*pro hac vice forthcoming*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: 206-516-3880
Facsimile: 206-516-3883
jschiltz@susmangodfrey.com

Samir Doshi (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: 212-336-8330
Facsimile: 212-336-8340
sdoshi@susmangodfrey.com

Argie Mina (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: 310-789-3100
Facsimile: 310-789-3150
amina@susmangodfrey.com

*Attorneys for Plaintiff SUNY RF*

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD..............................................................................................5

III.   ARGUMENT ..........................................................................................................5

     A.    SUNY RF's claims are likely to succeed on the merits.............................5

          1.    Breach of Contract .........................................................................5

              a)    The Parties Entered into the 2015 and 2017 Agreements...............6

              b)    SUNY RF Performed Its Obligations Under the Research Agreements.........................................................................7

              c)    Defendants Breached the 2015 and 2017 Research Agreements .....................................................................7

              d)    Defendants' Breaches Damaged SUNY RF .................................10

          2.    Correction of Inventorship.........................................................11

          3.    Unjust Enrichment ......................................................................12

          4.    Constructive Trust and Accounting ...........................................14

          5.    Conversion ..................................................................................15

          6.    Unfair Competition .....................................................................15

     B.    The balance of hardships weighs strongly in SUNY RF's favor...........16

     C.    SUNY RF will suffer irreparable harm in the absence of preliminary relief. ........................................................................................18

     D.    Issuing preliminary relief will serve the public interest.........................23

IV.   SUNY RF SHOULD NOT BE REQUIRED TO POST A BOND...................24

V.    CONCLUSION.....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asa v. Pictometry Int'l Corp.*,
757 F. Supp. 2d 238 (W.D.N.Y. 2010) ...................................................................24

*Ayco Co., L.P. v. Frisch*,
795 F. Supp. 2d 193 (N.D.N.Y. 2011) ...................................................................20

*Bank of Am., N.A. v. Won Sam Yi*,
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ...................................................................23

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015) ..........................................................................5, 22

*Blue Gentian, LLC v. Tristar Prod., Inc.*,
70 F.4th 1351 (Fed. Cir. 2023) ............................................................................11

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) ................................................................................18

*Broker Genius, Inc. v. Volpone*,
313 F. Supp. 3d 484 (S.D.N.Y. 2018) ...............................................................5, 12

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
766 F.2d 1319 (9th Cir.1985), *amended on other grounds,* 775 F.2d 998 (9th
Cir.) ..................................................................................................................24

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) ..................................................................................15

*Delaware Cnty. v. Leatherstocking Healthcare, LLC*,
110 A.D.3d 1211 (N.Y. App. Div. 2013) ...............................................................12

*Dexia Credit Loc. v. Rogan*,
2008 WL 4855416 (N.D. Ill. Nov. 10, 2008) ........................................................19

*Doctor's Assocs., Inc. v. Distajo*,
107 F.3d 126 (2d Cir. 1997) ................................................................................24

*Doctor's Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996) ..................................................................................23

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
31 N.Y.3d 441 (2018) ........................................................................................16

*Eng. V. Smith*,
    849 F.2d 80 (2d Cir. 1988).................................................................................5

*Ferguson v. Ruane Cuniff & Goldfarb Inc.*,
    2021 WL 5507028 (S.D.N.Y. Nov. 24, 2021) ........................................................24

*Greater Chautauqua Fed. Credit Union v. Marks*,
    600 F. Supp. 3d 405 (S.D.N.Y. 2022), *modified sub nom. Greater Chautauqua*
    *Fed. Credit Union v. Quattrone*, 2023 WL 6037949 (S.D.N.Y. Sept. 15, 2023) ....................24

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014).................................................................................22

*Harris v. Coleman*,
    863 F. Supp. 2d 336 (S.D.N.Y. 2012)...................................................................15

*Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*,
    103 F. Supp. 3d 244 (N.D.N.Y. 2015) .............................................................6, 16

*Ming v. Brouillette*,
    2023 WL 1951792 (N.D.N.Y. Jan. 24, 2023) .........................................................5

*Nastro v. D'Onofrio*,
    263 F. Supp. 2d 446 (D. Conn. 2003) ..................................................................19

*New York Land Co. v. Republic of Philippines*,
    634 F. Supp. 279 (S.D.N.Y.), *aff'd sub nom. Republic of Philippines v.*
    *Marcos*, 806 F.2d 344 (2d Cir. 1986) ..................................................................19

*Rabbi Jacob Joseph Sch. v. Province of Mendoza*,
    342 F. Supp. 2d 124 (E.D.N.Y. 2004) .................................................................19

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004).................................................................................20

*Republic of Panama v. Air Panama Internacional, S.A.*,
    745 F. Supp. 669 (S.D. Fla. 1988) .......................................................................19

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010)..................................................................23

*Roederer v. Treister*,
    2 F. Supp. 3d 1153 (D. Or. 2014) ........................................................................19

*Rowe v. Kingston*,
    94 A.D.3d 852 (2012) .........................................................................................14

*Shamrock Power Sales, LLC v. Scherer*,
　　No. 12CV8959, 2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016)................................18

*Sharp v. Kosmalski*,
　　40 N.Y.2d 119 (1976) ..........................................................................................14

*Simonds v. Simonds*,
　　45 N.Y.2d 233 (1978) ..........................................................................................14

*Ticor Title Ins. Co. v. Cohen*,
　　173 F.3d 63 (2d Cir.1999)....................................................................................20

*Winter v. Natural Res. Def. Council, Inc.*,
　　555 U.S. 7 (2008) .................................................................................................16

**Statutes**

35 U.S.C. § 256 .................................................................................................................11

35 U.S.C. § 116(a) ............................................................................................................21

**Rules**

Federal Rule of Civil Procedure 65 ....................................................................................5

Federal Rule of Civil Procedure 65(c) .............................................................................23

## I.    <u>INTRODUCTION</u>

SUNY RF is the research foundation in charge of licensing and bringing to market the groundbreaking research occurring across the State University of New York's 64 campuses. In fiscal year 2023 alone, SUNY RF executed 60 license agreements and managed a portfolio of 148 operational startups—all involving technology developed within the SUNY system. *See* Declaration of Matthew Mroz in Support of SUNY RF's Motion for Temporary Restraining Order and Preliminary Injunction ¶ 14. These tremendous efforts reflect SUNY's longstanding commitment "to the economic well-being of the State of New York and of the Nation." Mroz Decl. ¶ 7 (Ex. WW, at 1).

This case involves some of the world's most significant advancements in the field of semiconductors—technologies developed at SUNY which will usher in next generation of semiconductor development. Indeed, a Japanese government-backed fund called Japan Investment Corp. ("JIC") is about to purchase Defendants in a transaction valued at $6.4 billion to "strengthen Japan's global competitiveness in semiconductor materials." *Financial Times*, "The Japanese Semiconductor Deal Spooking Rivals and Investors," Jan. 29, 2024 (Ex. FF) (hereinafter "The Japanese Semiconductor Deal"). SUNY RF, however, has received no compensation despite several contractual provisions specifically granting to SUNY RF exclusive ownership and licensing rights in the IP it developed, and co-ownership rights in any technology jointly developed by SUNY RF and Defendants.

SUNY RF contacted Defendants months ago to alert them prior to the JIC transaction, and the parties promptly signed a tolling and confidentiality agreement allowing for the exchange of information. The parties' tolling agreement expired on January 22. SUNY promptly filed suit on January 25, alleging over 300 claims against both Defendants in a 367-page complaint. To this

day, Defendants continue to file patents based on SUNY's technology, claiming it as their own instead of giving SUNY RF credit (much less giving SUNY RF the rights it bargained for). The JIC merger is currently scheduled to close in late February. *Reuters*, "JIC Chief Says No Issues with Chinese Antitrust Regulator over JSR Buyout," Dec. 20, 2023, (hereinafter "No Issues with Chinese Antitrust Regulator") (Ex. GG). **And as JIC boasted only weeks ago, because it is "incorporated outside the United States," any claims against it will "be difficult to enforce."** *JSR*, "Announcement Concerning Progress of the Tender Offer for the Shares of JSR Corporation," Dec. 19, 2023 (Ex. HH) (hereinafter "Tender Offer Announcement").

In 2011, SUNY professor and world-renowned researcher Dr. Robert Brainard began developing a revolutionary technology in the field of photolithography—that is, the use of light to imprint patterns on the silicon wafers that make up microchips. Because of the incredibly small detail required, this field is also called EUV ("extreme-ultraviolet") photolithography. Dr. Brainard is the first chemist in the world to design photoresists for use in EUV Lithography. Dr. Brainard's research focused on improving the detail, quality, and resolution of the light patterns imprinted on the wafers. To achieve that goal, Brainard and his SUNY team invented a novel set of materials known as "molecular organometallic resists" ("MORE" or "MOR"). Their work was a breakthrough. The new MORE resists substantially outperformed those on the market, enabling—almost overnight—the manufacture of smaller, more powerful, and more cost- and energy-efficient microchips. EUV Lithography is now celebrated as a key to the continued advancement of semiconductors and keeping pace with "Moore's Law"—the doubling of transistors in the same area of silicon every two years.

As many universities do, Dr. Brainard and his team opened their research to industry, hoping collaboration would drive innovation. One industry participant was Defendant Inpria. In

2014, the company's CEO sought out Dr. Brainard, aiming to conduct additional research into molecular organometallic resists. Dr. Brainard agreed to share with Inpria all he and his team had learned, on one simple condition: Inpria could use Dr. Brainard's prior inventions to carry out the parties' joint research projects, but Inpria could not otherwise use or license Dr. Brainard's prior inventions. And the parties would co-own any joint IP. Inpria agreed, signing contracts in 2015 and 2017 promising to use the prized research in that limited manner.

But Inpria's was a paper promise only. Investigation has uncovered that Inpria received patent after patent—at least 25 in total—based on Dr. Brainard's work. One of those patents was issued only weeks ago. Yet Inpria failed to name Dr. Brainard as an inventor even once. Nor did it name *nine* other SUNY RF employees who contributed to the MORE technology incorporated into those patents. Indeed, despite agreeing to do so in the 2015 and 2017 Agreements, Inpria also failed to give any notice to SUNY RF of this extensive patent activity. Instead, Inpria remarkably held out *itself* and itself alone as "the world leader in metal oxide photoresist design, development and manufacturing." Compl. ¶ 9. And Inpria has now recently admitted that it has also commercialized the very products that Dr. Brainard and his team had developed, riding SUNY RF's IP to a recent valuation of over 6 billion dollars.

In less than five weeks, Inpria and its parent company, JSR, will try to make righting these wrongs impossible. By early March, JIC—almost entirely wholly-owned by the Government of Japan and overseen by its Ministry of Economy, Trade, and Industry (METI)—will consummate a tender offer to acquire both Defendants. Once it does, JIC plans to take SUNY RF's IP and run. JIC's announcement that any claims against it would be "difficult to enforce" came just *one month* after SUNY RF gave notice that it was contemplating legal action. JIC further proclaimed that

there "is no guarantee" that companies outside the United States could be compelled "to subject themselves to the jurisdiction of a U.S. court." *Supra*, "Tender Offer Announcement" (Ex. HH).

JIC has made clear that the acquisition of JSR is vital to Japanese interests. As JSR's CEO explained, the point of the transaction is "to advance . . . the Japanese economy." *Supra*, "The Japanese Semiconductor Deal" (Ex. FF). The head of METI was even more strident: the deal, he explained, is "an extremely important effort." *Id.* It "will strengthen Japan's global competitiveness in semiconductor materials pivotal to the production and development of cutting-edge chips." *Id.* The transaction is also awaiting approval by the Chinese government. *Id.* The upshot should be clear: If the Court does not act now, Defendants will attempt to ensure that SUNY RF forever loses the rights to its inventions—the very rights it bargained for.

SUNY RF requests a preliminary injunction to avoid the permanent, irreparable, and unprecedented loss of its intellectual property. That injunction should require JSR to:

- freeze prosecution of any patent applications and not initiate or file additional patent applications incorporating SUNY RF IP[1], including the Challenged Patents (*i.e.*, the patents listed in Appendix A to the complaint, their families, children, and foreign counterparts, whether granted and issued, pending, or yet-to-be-filed), without the consent of SUNY RF;

- cease licensing, either directly or indirectly, the Challenged Patents, including but not limited to JIC;

- cease assigning or transferring, either directly or indirectly, the Challenged Patents, as well as any other intellectual property based in whole or in part on SUNY RF IP, to any party, including but not limited to Tokyo Electron Limited ("TEL") or JIC;

- cease practicing (including making, using, exporting, or selling) SUNY RF IP, and comply with the contractual agreements not to use SUNY RF IP; and

---

[1] As used herein, "SUNY RF IP" includes all PRIOR PROJECT IP, FOUNDATION Inventions, SUNY RF's interest in any JOINT IP, as those terms are defined in the 2015 and 2017 Research Agreements, as well as the Challenged Patents and all other SUNY RF intellectual property disclosed to Defendants during the course of the 2015 and 2017 Research Agreements.

- contribute into an interest-bearing escrow account either (i) if Defendants are enjoined from practicing SUNY RF's IP, $257 million, which represents Inpria's unjust enrichment to date at SUNY RF's expense, or (ii) if Defendants are *not* enjoined from practicing SUNY RF's IP, $2.39 billion, which represents the low end of the present value of that IP.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, district courts may enter preliminary injunctive relief where the plaintiff shows (1) "a likelihood of success on the merits or" "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved" by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).[2] Each factor is satisfied here.

## III.    ARGUMENT

### A.    SUNY RF's claims are likely to succeed on the merits.

A plaintiff establishes a likelihood of success on the merits by showing "that the probability of his prevailing is better than fifty percent." *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng. V. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Each of SUNY RF's allegations clear this bar, and the Court need find only that *one* claim states a likelihood of success.

#### 1.    Breach of Contract

Demonstrating a breach of contract under New York law[3] requires a plaintiff to allege "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's

---

[2] "The legal standards governing preliminary injunctions and temporary restraining orders are the same." *Ming v. Brouillette*, 2023 WL 1951792, at *1 (N.D.N.Y. Jan. 24, 2023).

[3] *See* Mroz Decl. ¶ 54 (Ex. A, at 6) (2015 Research Agreement containing New York choice-of-law provision); Mroz Decl. ¶ 71 (Ex. E, at 6) (same for 2017 Research Agreement).

obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 254 (N.D.N.Y. 2015). Each element is present here.

> a)      The Parties Entered into the 2015 and 2017 Agreements

In 2015, and again in 2017, SUNY RF and Inpria entered contracts governing their research and development project entitled "Molecular Organometallic Resists for EUV (MORE)." Compl. ¶¶ 96–98, 120 (discussing the 2015 Research Agreement ("2015 SRA") and the 2017 Research Agreement ("2017 SRA")). The Agreements addressed three types of IP relevant here.

*First*, SUNY RF agreed to disclose to Inpria certain IP that it had previously created, delineated as "PRIOR PROJECT IP." Mroz Decl. ¶ 54 (Ex. A, at 4) (2015 SRA); Mroz Decl. ¶ 71 (Ex. E, at 4) (2017 SRA); *see also* Mroz Decl. ¶¶ 19–48; *id.* Exs. 1–10 (providing true and correct copies of SUNY RF's PRIOR PROJECT IP). However, the Agreements specified that Inpria's license to use that IP was limited. In particular, Inpria could use SUNY RF's PRIOR PROJECT IP only as necessary "to complete and carry out the" parties' joint research efforts—and not for any other purpose. Mroz Decl. ¶ 54 (Ex. A, at 4) (2015 Agreement); Mroz Decl. ¶ 71 (Ex. E, at 4) (2017 SRA); *see also* Compl. ¶¶ 97–98; Mroz Decl. ¶¶ 59–60 (discussing PRIOR PROJECT IP licenses). An Amendment to the 2015 Agreement made this even clearer. Although SUNY RF would "provide the PRIOR PROJECT IP disclosures to" Inpria, the parties agreed "[t]he disclosures are confidential information of FOUNDATION and SPONSOR will *only* use the disclosures and the information contained in the disclosures to carry out the PROJECT." Mroz Decl. ¶ 67 (emphasis added).

*Second*, the Research Agreements addressed IP that was "generated, conceived or reduced to practice during the conduct of work under this Agreement utilizing facilities or personnel of [SUNY RF] or its affiliates exclusively." Compl. ¶ 102. Such IP was termed "FOUNDATION

Inventions," *id.*, and the Research Agreements granted "no license or other rights in FOUNDATION Inventions" to Inpria or any of its successors. Compl. ¶¶ 103–06.

*Third*, the Research Agreements provided that SUNY RF and Inpria would hold joint title to all IP rights that had not been generated exclusively by either Inpria or SUNY RF, referred to as "JOINT IP." Mroz Decl. ¶ 54 (Ex. A, § 9(e)) (2015 SRA); Mroz Decl. ¶ 71 (Ex. E, § 9(e)) (2017 SRA). Again, SUNY RF granted no license or other rights in its interest in any JOINT IP to Inpria or any of its successors. Compl. ¶ 110; Mroz Decl. ¶¶ 59–60.

> b)   *SUNY RF Performed Its Obligations Under the Research Agreements*

SUNY RF performed all obligations under both contracts: it conducted and carried out the Research Projects, provided Dr. Brainard as the principal investigator to supervise and conduct the work on the Projects, contributed its PRIOR PROJECT IP, and shared its FOUNDATION Inventions and JOINT IP with Inpria, via invention disclosure reports, confidential presentations, and confidential research updates. *See, e.g.*, Compl. ¶¶ 152–56, 175–86, 202–05, 226–33, 254–58, 276–86, 305–16, 333–37, 356–65, 384–95.

> c)   *Defendants Breached the 2015 and 2017 Research Agreements*

Defendants have repeatedly breached and continue to breach the 2015 and 2017 Research Agreements. *First*, Defendants used and continue to use SUNY RF's IP in violation of the Agreements, including using, manufacturing, offering for sale, selling, exporting, and licensing EUV metal oxide photoresists and related materials. Compl. ¶¶ 404–19. For example, Defendants now tout that their main product is a "tin-oxide photoresist," offering for sale at least three different tin-based photoresists as part of its "Y-series": YA-BA, YF-AA, and YD-AA. Compl. ¶¶ 425–26. However, it was *Dr. Brainard* who such invented tin-oxide photoresists, and this technology was disclosed as SUNY RF's PRIOR PROJECT IP to Inpria. Compl. ¶ 164. For example, in invention

disclosure report "RN2-11-27: Molecular Organometallic Resists for EUV (MORE): Oxalate Transition Metal Resists), conceived on June 28, 2011, Dr. Brainard disclosed the use of tin-oxoclusters as photoresists, and noted the "rich" chemistry of tin, and explained its benefits for use in photoresist, particularly when compared to hafnium oxide compounds. Compl. ¶ 288. Similarly, in invention disclosure report "RN2-11-27.2: Molecular Organometallic Resists for EUV," also conceived on June 28, 2011, Dr. Brainard invented the use of "organo-tin and organo-bismuth compounds or polymers as resists for use in Extreme Ultraviolet Lithography." Compl. ¶ 345. The inventions discussed in RN2-11-27 and RN2-11-27.2 both constituted PRIOR PROJECT IP under the terms of both SRAs. SUNY RF disclosed both inventions to Inpria for use solely in furtherance of the parties' joint research projects. Compl. ¶¶ 96–108, 126–38. In federal court filings in Delaware on October 14, 2022, and December 13, 2023, Inpria has now judicially *admitted* that it "practices" these SUNY RF inventions. Mroz Decl. ¶¶ 105–108, 124–126; Compl. ¶¶ 22, 25, 429.

*Second*, Defendants breached and continue to breach the Research Agreements by incorporating the technology disclosed in SUNY RF's PRIOR PROJECT IP into the provisional patent applications and patent applications that matured or will mature into the Challenged Patents. *See* Compl. ¶¶ 137–403. For example, on August 29, 2023, Inpria was granted U.S. Patent No. 11,740,559 (the " '559 Patent"), the subject matter of which SUNY RF invented as a FOUNDATION Invention under the 2015 SRA, and which SUNY the parties agreed constituted PRIOR PROJECT IP to the 2017 SRA, *see* Mroz Decl. ¶ 71 (Ex. E, § 10). The '559 Patent is titled "Apparatuses for reducing metal residue in edge bead region from metal-containing resists," and claims, in part:

> A method of cleaning a substrate provided with a metal-based resist, the method comprising cleaning a substrate provided with a metal-based resist comprising at least one metal selected from the group consisting of Sn, Hf, Zr, In, Te, Sb, Ni, Co, Ti, W,

Ta, and Mo using a metal resist cleaning liquid comprising an organic solvent and a carboxylic acid, thereby removing the metal-based resist from the substrate.

'559 Patent, Claim 1; see also Compl. ¶¶ 27–28.

But it was Dr. Brainard and his researchers—not Inpria—that conceived of and reduced to practice using an organic solvent with a carboxylic acid to remove residue from a metal-based resist. *See* Compl. ¶¶ 208–28. In February 2015, Dr. Brainard, with the assistance of Jodi Hotalen and William Earley (who later went to work for Inpria), conceived of the subject matter contained in the '559 Patent. Indeed, as described in SUNY RF's Technology Disclosure Form RN2-15-15, "Carboxylic Acid Developers for Metal-Based EUV Resist," Dr. Brainard and his fellow inventors describe the use of carboxylic-acid developers to develop, or "clean," metal-based resists. Mroz Decl. ¶ 46 & Ex. 10. Dr. Brainard and his team noticed that when developing metal-based resists with an amine-based ligand, the amine "left a residue in exposed regions after development." Mroz Decl. ¶ 46 & Ex. 10, at 3. The addition of carboxylic acids to an organic solvent, they discovered, removed residue and achieved clear, positive tone results in the exposed regions. *Id.*

Yet Inpria has now claimed this invention as its own and sold it off to a third party. In filing U.S. Patent Application No. 17/498,437 (which matured into the '559 Patent) on October 11, 2021, and obtaining '559 Patent in August 29, 2023, Inpria breached the Research Agreements by using SUNY RF's FOUNDATION Invention under the 2015 SRA and its PRIOR PROJECT IP under the 2017 SRA beyond the scope permitted by each Research Agreements.[4] The same breaches hold true for the 24 other Challenged Patents that Inpria has claimed as its own.

---

[4] The ' 559 patent was specifically defined as SUNY RF PRIOR PROJECT IP in Exhibit C of the 2017 SRA, in an invention disclosure entitled "Carboxylic-Acid Developers for Metal-Based EUV Resists." *See* Mroz Decl. ¶ 117; *see also* Compl. ¶ 105, 436–439 (discussing similar for first amendment to 2015 SRA).

In fact, two of Dr. Brainard's research assistants—Brian Cardineau and William Early—later decamped for Inpria and attempted to patent the very same technology they worked on while at SUNY with Dr. Brainard. Worse, Inpria continues to seek and obtain patents on SUNY RF's IP to this day, filing patent applications in November 2023—even after receiving notice and signing a Tolling and Non-Disclosure Agreement with SUNY RF—and receiving another Challenged Patent earlier this month (January 2024). *See* Mroz Decl. ¶¶ 120–123.

*Third*, Defendants have also breached the Research Agreements by transferring ownership of SUNY RF's IP to third parties, including TEL, by way of assigning patents—including, at least, the '559 Patent, and U.S. Patent Nos. 10,627,719, U.S. 11,187,986, and U.S. 11,480,874—without renumeration to SUNY RF and without its consent. Compl. ¶¶ 32, 215, 241; Mroz Decl. ¶ 118.

*Fourth*, by assuming control over the prosecution of the Challenged Patents—and by failing to perfect and protect SUNY RF's rights in the process of doing so—Defendants have also breached the contractual requirement to "protect the [IP] ownership rights" established by the Agreements and to "cooperate" with SUNY RF accordingly. Mroz Decl. ¶ 54 (Ex. A, at 5, § 9(j)) (2015 SRA); Mroz Decl. ¶ 71 (Ex. E, at 6, § 9(j)) (2017 SRA).

### d) Defendants' Breaches Damaged SUNY RF

As a direct and proximate cause of Defendants' material and continuing breaches of the Research Agreements, SUNY RF has suffered and continues to suffer damage, including because it (i) does not have ownership over the patents which incorporate its inventions; and (ii) has not received its rightly due profits, proceeds, and other benefits derived from the commercialization, licensing, and sale of its IP. This harm is ongoing, as Defendants continue to practice and patent SUNY RF's IP, and, assign, license, and sell that IP to third parties (namely, TEL and JIC).

2.      Correction of Inventorship

It is well established that "[a]ll inventors, even those who contribute to only one claim or one aspect of one claim of a patent, must be listed on that patent." *Blue Gentian, LLC v. Tristar Prod., Inc.*, 70 F.4th 1351, 1357 (Fed. Cir. 2023) (citation omitted). Under 35 U.S.C. § 256, therefore, a district court may order correction of inventorship when a party shows that a sole or joint inventor has been erroneously omitted from a patent.

As detailed in the complaint, Dr. Brainard and his team of researchers invented one or more claims of the Challenged Patents and should be listed as either sole or joint inventors of them. The complaint illustrates the subject matter of each Challenged Patent and the prior conception and reduction to practice thereof by Dr. Brainard and his team, corroborated by numerous invention disclosure reports and research presentations sent to Inpria over several years. *See, e.g.*, Compl. ¶¶ 152–56, 175–86, 202–05, 226–33, 254–58, 276–86, 305–16, 333–37, 356–65, 384–95.

For example, the complaint alleges that Dr. Brainard and his team invented Claim 1 of the '559 Patent, which claims "[a] method of cleaning a substrate provided with a metal-based resist, the method comprising cleaning a substrate provided with a metal-based resist comprising at least one metal selected from the group consisting of Sn, Hf, Zr, In, Te, Sb, Ni, Co, Ti, W, Ta, and Mo using a metal resist cleaning liquid comprising an organic solvent and a carboxylic acid, thereby removing the metal-based resist from the substrate." Compl. ¶ 200. But Dr. Brainard conceived of the invention "to use carboxylic acids in organic or aqueous solvents as developers for organometallic (MORE) photoresist" back on February 19, 2015, which SUNY RF's invention disclosure report RN2-15-15 concerning "Carboxylic-Acid Developers for Metal-Based EUV Resists" corroborates. Compl. ¶ 202. The complaint also notes various confidential research presentations that Dr. Brainard and his team sent to Inpria regarding their invention of using

carboxylic acid developers to clean metal-based resists, further corroborating Dr. Brainard's invention of the '559 Patent. Compl. ¶¶ 203–06. Dr. Brainard had also already conceived of using the specific metal elements listed in Claim 1 of the '559 Patent— Sn, Hf, Zr, In, Te, Sb, Ni, Co, Ti, W, Ta, and Mo—in June 28, 2011, which he disclosed in invention disclosure report RN2-11-27 concerning Molecular Organometallic Resists for EUV (MORE). Compl. ¶ 267.

The complaint corroborates and proves inventorship for each of the Challenged Patents. *See* Compl. ¶¶ 152–56, 175–86, 202–05, 226–33, 254–58, 276–86, 305–16, 333–37, 356–65, 384–95. Given the corroborating evidence detailed in the complaint, SUNY RF has established a "better than fifty percent likelihood" that the Challenged Patents must be corrected to list Dr. Brainard and his team as inventors. *Broker Genius,* 313 F. Supp. 3d at 497.

### 3.   Unjust Enrichment

SUNY RF also is likely to succeed on its claim for unjust enrichment, because (1) Defendants were enriched; (2) at SUNY RF's expense; and (3) it is against equity and good conscience to permit Defendants to retain that benefit. *Delaware Cnty. v. Leatherstocking Healthcare, LLC*, 110 A.D.3d 1211, 1213 (N.Y. App. Div. 2013).

*First*, Defendants were enriched. By using SUNY RF's technology, Inpria became widely successful: the company received investments from major investors in the semiconductor industry and obtained scores of patents for metal oxide photoresist technology. Compl. ¶¶ 33–34. Inpria was further enriched when it was acquired for $514 million in October 2019—a transaction based principally on JSR's interest in Inpria's metal oxide photoresist technology and IP portfolio. Compl. ¶ 34; *see JSR*, "JSR Agrees to Acquire EUV Pioneer Inpria Corporation," Sept. 17, 2021 (Ex. II). JSR, meanwhile, was similarly enriched when it acquired Inpria. JSR gained access to the technology that SUNY RF invented, enabling JSR to create a global research and development

supply chain and to enter new partnerships with third parties based on metal oxide photoresist technology. Compl. ¶¶ 34–39. Finally, Defendants were enriched by JIC's tender offer to acquire JSR at $6.4 billion. That valuation was owed in large part to JIC's interest in JSR's—that is, SUNY RF's—metal oxide photoresist technology. Compl. ¶ 40.

*Second*, Defendants' enrichment came at SUNY RF's expense. Inpria and JSR patented and commercialized SUNY RF's technology without compensating or acknowledging SUNY RF. SUNY RF suffered injury because it does not own the patents that contain its inventions nor does it have control over those patents—for example, to prevent their assignment or transfer. SUNY RF further suffered because it expended time, resources, and energy researching and inventing the technology at issue. *See* Compl. ¶¶ 142–404. SUNY RF did not receive *any* compensation for those efforts; Inpria never exercised its options to enter into a licensing agreement, shared profits, or any form of benefit with SUNY RF. Defendants' unjust enrichment has also damaged SUNY RF's reputation within the semiconductor industry and its relationships with other semiconductor companies. For instance, Inpria assigned several of the Challenged Patents to third party TEL, *see* compl. ¶¶ 32, 215, 241, with which SUNY RF has a working relationship. Because of Inpria's actions, SUNY RF is in the complicated position of having to assert its rights over IP that was improperly, and without notice, assigned to one of its own business and development partners. *See* Mroz Decl. ¶ 13 (Ex. ZZ) (statement from New York Governor Kathy Hochul that TEL will join research efforts at the High NA EUV Center at the New York State Albany NanoTech Complex).

*Third*, permitting Inpria and JSR to retain the patents, profits, and other benefits they received from claiming SUNY RF's technology as their own would be inequitable. SUNY RF—specifically Dr. Brainard and his team—expended significant effort into researching and

developing the IP at issue. Defendants meanwhile specifically promised, in two separate agreements, not to use that IP without SUNY RF's permission. They did anyway.

4.  Constructive Trust and Accounting

Where "property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest," a court may order a constructive trust and accounting. *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978). Four factors are generally considered in that analysis: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976). Importantly, these factors "serve only as a guideline," and "a constructive trust may still be imposed even if all of the elements are not established." *Rowe v. Kingston*, 94 A.D.3d 852, 853 (2012) (citations omitted). All four factors are, however, present here.

*First*, SUNY RF and Inpria had a confidential relationship established by the Research Agreements. Compl. ¶¶ 96–141. For example, both Agreements were designated confidential, and included confidentiality provisions, and the 2015 SRA specifically provided that SUNY RF's disclosures of its PRIOR PROJECT IP "are confidential information." *See* Compl. ¶ 105. The written MORE reports sent by SUNY RF to Inpria also were designated confidential. *Second*, Inpria promised it would not use SUNY RF's intellectual property without consent and agreement. Compl. ¶¶ 96–141. *Third*, in reliance on Inpria's promise, SUNY RF disclosed its IP to Inpria via invention disclosures and confidential research presentations. *See* Compl. ¶¶ 142–404. And *fourth*, as described above, Inpria has been unjustly enriched by using SUNY RF's IP to obtain patents, garner investments, develop products, earn profits, and reap the benefits of multi-million (and soon to be multi-billion dollar) transactions. Compl. ¶¶ 33–40. SUNY RF thus has demonstrated a

likelihood of success on its claim that Inpria and JSR are constructive trustees of SUNY RF's intellectual property as well as all the benefits that have flowed from it.

      5.    <u>Conversion</u>

To state a claim for conversion, a plaintiff must allege that the defendant acted without authorization, the defendant exercised dominion or right of ownership over property belonging to the plaintiff, the plaintiff has made a demand for the property, and that demand has been refused. *Harris v. Coleman*, 863 F. Supp. 2d 336, 342 (S.D.N.Y. 2012). Plaintiff must also 'demonstrate legal ownership or an immediate superior right of possession to a specific identifiable thing.'" *Id.*

*First*, Defendants acted without authorization—indeed, contrary to the terms of the Research Agreements—when they obtained the Challenged Patents by using SUNY RF's IP without permission. Compl. ¶¶ 96–153. *Second*, Defendants exercised dominion or right of ownership over SUNY RF's IP by obtaining the patents without including Dr. Brainard and his team as inventors and without assigning any interest in those patents to SUNY RF. *Id.* ¶¶ 169–75, 199–207, 218–28, 247–55, 271–77, 299–306, 332–36, 349–57, 378–85, 408–15. *Third* and *fourth*, SUNY RF made a demand for the Challenged Patents in pre-suit discussions, which Defendants refused. *See* Mroz Decl. ¶ 120 (Ex. DDD). Finally, as discussed above and throughout the Complaint, SUNY RF's allegations demonstrate its inventorship and contractual rights and thus ownership of the Challenged Patents and the IP underlying them.

      6.    <u>Unfair Competition</u>

A party is liable for unfair competition "if they unfairly exploit 'the skill, expenditures and labors' of a competitor." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 449 (2018). Here, Defendants unfairly exploited SUNY RF's IP by using that IP without SUNY RF's consent. Under the Research Agreements, SUNY RF has exclusive rights to its PRIOR PROJECT IP and

its FOUNDATION Inventions, which were a result of SUNY RF's efforts. Compl. ¶¶ 96–153. Absent further agreement, SUNY RF agreed to share its IP with Inpria *only* for the limited purpose of carrying out the research project. *Id.* ¶ 109, 115. Inpria's continued use of SUNY RF's IP thus constitutes unfair exploitation of SUNY RF's and labor.

Finally, even if SUNY RF had failed to demonstrate a likelihood of success on any particular claim, a preliminary injunction may still issue where the plaintiff demonstrates "there is a sufficiently serious question going to the merits" and "a balance of hardships tipping decidedly" in the plaintiff's favor. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Here, SUNY RF has at a minimum raised serious questions regarding Defendants' liability for the asserted claims. And, as discussed in the following section, the balance of hardships decidedly tips in SUNY RF's favor.

### B.    The balance of hardships weighs strongly in SUNY RF's favor.

In deciding a motion for preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 262 (N.D.N.Y. 2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Here, the balance of hardships tips decidedly in SUNY RF's favor.

*First*, if SUNY RF does not receive preliminary relief, it may not be able to receive *any* relief at all. On December 19, 2023, JSR and JIC issued announcements regarding the JSR-JIC tender offer. They cautioned that (i) "[i]t may be difficult to enforce any right or claim" against JIC or JSR; and (ii) "there is no guarantee that shareholders will be able to compel a company outside the United States or its subsidiaries and affiliates to subject themselves to the jurisdiction of a U.S. court." *Supra*, "Tender Offer Announcement" (Ex. HH); *see* Mroz Decl. ¶ 113 (Ex.

CCC). Tellingly, JSR and JIC only released these statements *after* SUNY RF had contacted Defendants notifying them of their repeated breaches of the Research Agreements.

Since then, additional press statements by JSR and JIC have further confirmed that they are unlikely to submit to this Court's jurisdiction. For example, the head of the Japanese Ministry of Economy, Trade, and Industry—the same "branch of government that dictated and crafted Japan's industrial policy during its stunning postwar economic recovery"—has observed that closing the JSR transaction is "extremely important." *Supra*, "The Japanese Semiconductor Deal" (Ex. FF). In his view, JSR is essential to "strengthen[ing] Japan's global competitiveness in semiconductor materials pivotal to the production and development of cutting-edge chips." *Ibid.* It is doubtful that the Japanese government would accede to a judgment placing IP "extremely important . . . [to] strengthen[ing] Japan's global competitiveness" back into the hands of a U.S. entity. SUNY RF may therefore be left without a remedy at all, even though Defendants *continue* to breach the Agreements. As explained, Defendants continued to receive patent grants—as recently as this month—based on SUNY RF's IP. And they have no intent of slowing down. Defendants' patent activity and relationship with JIC only *strengthened* after SUNY RF informed Defendants of their breaches and violations of the law. *See* Mroz Decl. ¶ 121, 123.

On the other hand, Defendants—large and financially successful—are unlikely to face serious hardship if preliminary relief is granted. JSR is a global company with several departments and revenue streams, and all publicly available information regarding its finances point to a tremendous capital base. *See JSR*, "JSR Report 2023 For the Year Ended March 31, 2023," at 9 Jan. 8, 2023 (noting 2022 revenue of 208.9 billion yen, and 2022 operating profit of 29.4 billion yen) (Ex. JJ). JSR is not dependent on the JIC acquisition to continue its business. To the contrary, the acquisition is allowing the country of Japan to expand JSR's already massive market share of

the semiconductor industry. *See Reuters*, "Japan's JSR Says It Is Considering Being Bought by State-Backed JIC," June 23, 2023 ("The deal would grant JSR, with its 30% share of the global photoresist market, greater freedom for expansion . . . .") (Ex. KK).

Granting preliminary relief will provide the Court the opportunity to establish the rights and liabilities pertaining to SUNY RF's IP before those rights (and the money necessary to satisfy any judgment) could be lost to the jurisdictional gambit that is JSR and JIC's proposed merger.

### C.    SUNY RF will suffer irreparable harm in the absence of preliminary relief.

Irreparable harm exists where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The risk of such irreparable harm here is overwhelming.

*First*, JSR just last month indicated an "intent to frustrate any judgment on the merits." *Shamrock Power Sales, LLC v. Scherer*, 2016 WL 6102370, at *2 (S.D.N.Y. Oct. 18, 2016). JSR has issued multiple statements indicating its view that it is not subject to the jurisdiction of U.S. courts. *Supra*, "Tender Offer Announcement" (Ex. HH). And consummation of the JSR-JIC transaction is "extremely important" to the Japanese government. *See Supra*, "The Japanese Semiconductor Deal" (Ex. FF).[5] Courts have repeatedly found irreparable harm exists in such

---

[5] *See also CNBC*, "Japan-backed Fund to Buy Critical Semiconductor Firm JSR for $6.3 Billion as Chip Tensions Rise," June 26, 2023 (Ex. MM) ("Japan wants to double down on its comparative advantage in material . . . [a]t the same time, countries are trying to secure their own supply chains and build up their domestic chip industries. . . . "JIC's investment in JSR means that the government might have a higher say over its decisions."); *East Asia Forum*, "Japan's Semiconductor Revival," Sept. 27, 2023 (Ex. NN) (discussing the Japanese government's efforts "to play a significant role in reviving Japan's semiconductor ecosystem" and challenge foreign semiconductor manufacturers by, among other things, consummating the JSR-JIC transaction); *The Register*, "Japan Kind-Of Nationalizes Key Chipmaking Material-Maker JSR," June 27, 2023 (Ex. OO) (discussing JSR-JIC transaction in context of Japan's goal to "restor[e] Japan's semiconductor industry to global prominence"); *Reuters*, "Japan's JIC Sees M&A Options in

circumstances—that is, where "the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction." *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 342 F. Supp. 2d 124, 126 (E.D.N.Y. 2004); *see also Nastro v. D'Onofrio*, 263 F. Supp. 2d 446, 459 (D. Conn. 2003) (finding irreparable harm where defendant "transferred his interests in the Connecticut companies off-shore for purposes of avoiding [the plaintiff's] judgment"); *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 674 (S.D. Fla. 1988) ("If [defendants] are permitted to transfer the assets of Air Panama to the Noriega/Palma regime, the property will likely be beyond the reach of plaintiff and of this Court, and irretrievably dissipated and lost. This possibility is itself sufficient to support a finding of irreparable injury."); *New York Land Co. v. Republic of Philippines*, 634 F. Supp. 279, 288 (S.D.N.Y.), *aff'd sub nom. Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) (similar); *Dexia Credit Loc. v. Rogan*, 2008 WL 4855416, at *8 (N.D. Ill. Nov. 10, 2008) (similar).

    *Second*, when Defendants "sell or transfer [SUNY RF's] intellectual property," SUNY RF will "be deprived of ownership rights and may not be able to undo a transfer." *Roederer v. Treister*, 2 F. Supp. 3d 1153, 1161, 1164 (D. Or. 2014) (granting preliminary injunction ordering defendants

---

Chipmaking Niches after $6.4 Billion JSR Buyout," June 27, 2023 (Ex. PP) ("The JSR deal is the latest of a series of increasingly muscular government steps to try to regain Japan's lead in advanced semiconductor production and maintain its edge as a maker of materials and tools used in their manufacture."); *Kyodo News*, "Japan State-Backed Fund to Buy JSR to Enhance Chip Supply Chain," June 26, 2023 (Ex. QQ) (recognizing that Development Bank of Japan will help finance JSR-JIC transaction); *Be In Crypto*, "Japan Allocates $6.4B to Strengthen its Position in the Chip Wars," July 3, 2023 (Ex. RR) (observing one analyst, in the context of the "chip wars," found it "unclear whether the deal is privatizing or nationalization an important strategic asset," and citing one analyst commenting that "[t]here was a feeling that we weren't supposed to get to the bottom of this"); *The Economic Times*, "Japan Fund Eyes Buyout as Tokyo Ramps Up Chip Intervention," (June 26, 2023) (Ex. SS) (observing that, after the acquisition, JIC "will be able to invest in advanced materials," as it is currently "falling behind a little in EUV"); *Nikkei Asia*, "Japan State-Backed Fund Looks to Buy Top Photoresist Maker JSR," June 24, 2023 (Ex. TT) (explaining that JIC "is making the move from a national economic security perspective").

to (i) "not transfer any intellectual property and assets in any way related to the allegations made in this case"; (ii) "do nothing to transfer, sell, harm, diminish or dilute the value of the intellectual property and assets referenced"; and (iii) place funds into escrow to compensate plaintiff). And even if SUNY RF could seek to claw back some of its IP, doing so would require SUNY RF to litigate against entities with whom it currently has research or business relationships. For example, Defendants have currently assigned several of SUNY RF's patents to Tokyo Electron Limited—a business partner of SUNY RF's. *See* Compl. ¶¶ 32, 215, 241. And public reports have confirmed that one of the goals of the Japan-backed JIC is to continue such sales to third parties. *See Supra*, "No Issues with Chinese Antitrust Regulator" (demonstrating JSR's intention to enter the Chinese market post-acquisition) (Ex. GG); *The Japan Times*, "CEO Who Drove $7 Billion Deal is Eyeing Japan Chip Linchpin JSR," Jan. 15, 2024 (discussing the intent of other Japanese entities to purchase assets in JSR once it is acquired by JIC) (Ex. LL). In the absence of injunctive relief, SUNY RF will have no control over which of its IP is sold to which parties in which countries— whether to its current business partners, or to entities that desire to work against the interests "of New York and of the Nation." Mroz Decl. ¶ 7 (Ex. WW, at 1).

The failure to issue injunctive relief will force SUNY RF into countless irreparable difficulties. And it is well established that the loss of reputation, good will, and business opportunities that SUNY RF will suffer also constitutes irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 205 (N.D.N.Y. 2011) (finding in a breach of contract action, "loss of client relationships and customer good will built up over the years constitutes irreparable harm"). As these and other courts have recognized, "[m]onetary damages are insufficient to compensate such loss, as it is 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship

with a client that would produce an indeterminate amount of business in years to come.'" *Ayco*, 795 F. Supp. 2d at 205 (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir.1999)).

This Court should grant each of the five grounds for relief to avoid these irreparable harms.

*First*, the Court should order Defendants to freeze prosecution of any patent applications and not initiate or file additional patent applications incorporating SUNY RF IP. After giving Inpria notice of its potential legal claims on November 6, 2023, SUNY RF entered into a tolling agreement with Inpria on November 14, 2023. *See* Mroz Decl. ¶¶ 120, 122. Nevertheless, Inpria *immediately* filed a new patent continuing from a Challenged Patent on November 28, 2023. *See* Mroz Decl. ¶ 123. And just a few weeks ago it was granted a new Challenged Patent from a continuation of *another* Challenged Patent. *See* Mroz Decl. ¶ 130. These actions irreparably harm SUNY RF. For one, Defendants are obligated to "protect the [IP] ownership rights" established by the Agreements and to "cooperate" with SUNY RF accordingly. Mroz Decl. ¶ 54 (Ex. A, at 5, § 9(j)) (2015 Research Agreement); Mroz Decl. ¶ 71 (Ex. E, at 6, § 9(j)) (2017 Research Agreement). Defendants, however, are actively derogating those rights and harming SUNY RF's interests. That ongoing breach must be enjoined. For another, joint owners of IP (to say nothing of the fact that SUNY RF is likely to be found a *sole* owner) are *required* to jointly appear before the Patent Office during prosecution. *See* 35 U.S.C. § 116(a). And the entity that prosecutes a patent retains significant, irreparable authority: it chooses what gets patented, how it gets patented, the breadth at which it is patented, when, and to whom the patent gets assigned. And if that prosecution strategy is ill-conceived or even poorly effectuated, that conduct significantly diminishes the value of the IP being prosecuted (a bell that cannot be unrung). Inpria's steadfast refusal to include SUNY RF in proceedings before the Patent Office has irreparably harmed and will continue to irreparably harm SUNY RF until Inpria is enjoined.

21

*Second*, the Court should order Defendants to cease licensing the Challenged Patents. Despite what the Research Agreements and the patent laws provide, Defendants have taken the position that they may unilaterally license SUNY RF's IP to *anyone* in the world—including entities that may be judgment proof or outside this Court's jurisdiction. SUNY RF, meanwhile, cannot exercise those same rights (or do anything else with its IP) because Defendants have omitted SUNY from that IP: SUNY RF cannot control who receives that IP, how the IP is used, for how much, or even if the IP is protected and secured as it should be. Yet those rights are precisely the ones that SUNY RF contracted for. Mroz Decl. ¶ 54 (Ex. A, at 3–5, §§ 9(a)–(c), (h), (k)) (2015 Research Agreement); Mroz Decl. ¶ 71 (Ex. E, at 3–5, §§ 9(a)–(c), (h), (k)) (2017 Research Agreement). And it did so for a *reason*: SUNY RF's rights under the Agreements were designed to ensure that the IP at issue here—technology critical to revolutionizing one of the most important fields in modern commerce—promotes "the economic well-being of the State of New York and of the Nation." Mroz Decl. ¶ 7 (Ex. WW, at 1).

*Third*, the Court should order Defendants to cease assigning or transferring the Challenged Patents, as well as any other intellectual property based on SUNY RF IP. As above, Defendants' actions prevent SUNY RF from exercising the contractual rights for which it bargained. Moreover, without such relief, SUNY RF's rights to the Challenged Patents risk being unenforceable the moment that the JIC transaction consummates—in less than a month's time.

*Fourth*, the Court should order Defendants to cease practicing (including making, using, exporting, or selling) SUNY RF's IP, and comply with the contractual agreements not to use SUNY RF IP. Defendants' continuous and ongoing breach of the parties' Agreements irreparably harms SUNY RF by depriving it of the goodwill it is entitled to for its own inventions. Moreover, as discussed, Defendants' practice of SUNY RF's IP is irreparably harming SUNY RF by

preventing it from using that IP as it intended: to benefit "the economic well-being of the State of New York and of the Nation." Mroz Decl. ¶ 7 (Ex. WW, at 1). Absent an injunction, that uncompensable harm will only be magnified, as JSR continues (and JIC desires) to sell products based on SUNY RF's IP across the world. *See Supra*, "No Issues with Chinese Antitrust Regulator" (indicating JSR and JIC's intention to enter the Chinese market) (Ex. GG).

*Fifth*, the Court should order Defendants to place into escrow, if Defendants are enjoined from practicing the Challenged Patents, $257 million, which represents Inpria's minimum unjust enrichment to date, or (ii) if Defendants are *not* enjoined from practicing SUNY RF's IP, $2.39 billion, which represents the low end of the present value of that IP.[6] *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (courts may order funds placed into escrow "where the plaintiff is pursuing a claim for final equitable relief" and the escrow funds "is ancillary to the final relief" requested). Without such an escrow, Defendants risk dissipating their assets once the JIC transaction consummates.

### D. Issuing preliminary relief will serve the public interest.

Granting SUNY RF's requested preliminary injunction will serve the public interest. *First*, "the public interest here is served by the enforcement of the parties' lawful agreement." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015); *see also Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 76 (W.D.N.Y. 2018) (finding public interest is served by enforcing contractual obligations); *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) (same). *Second*, the IP was developed, and the Agreements were entered into, for the express purpose to further the public interest. For example, SUNY RF's

---

[6] As explained in the Declaration of David A. Kennedy—an expert in IP valuation, licensing, and transactions—the value of SUNY RF's IP is, at the low end, $2.39 billion or, at the high end, $4.29 billion. Declaration of Intellectual Property Value by David A. Kennedy ¶ 110.

official Patents and Inventions Policy states that it is SUNY RF's policy to pursue the "spirit of cooperation" between "governmental agencies and private industry" as "part of SUNY's contribution to the economic well-being of the State of New York and of the Nation." Mroz Decl. ¶ 7 (Ex. WW, at 1). *Third*, SUNY RF expressly conditioned disclosing its IP on Defendants' promise to *not* use it beyond the scope of the parties' joint research efforts. It would flout the public interest to allow Defendants to continue doing exactly what they pledged not to: use, commercialize, and benefit from SUNY RF's IP without its permission.

## IV.    <u>SUNY RF SHOULD NOT BE REQUIRED TO POST A BOND.</u>

The Court should not require SUNY RF to post a bond to secure a preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court determines the amount of security, if any, the movant should provide "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But "the District Court is vested with wide discretion in the matter of security." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

The Court should not require a bond here for four reasons.

*First*, SUNY RF is a 501(c)(3) organization, organized as a non-profit entity. Courts have frequently recognized that requiring bonds from nonprofit entities is inappropriate, especially where doing so "would effectively deny access to judicial review." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,* 766 F.2d 1319, 1325 (9th Cir.1985), *amended on other grounds,* 775 F.2d 998 (9th Cir.); *see also People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir.), *amended,* 775 F.2d 998 (9th Cir. 1985) (taking into account non-profit status of movant).

*Second*, a bond is unwarranted because "the injunction does no more than preserve the preexisting status quo, in which the parties were engaged in an ongoing contractual relationship."

*Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010). Preventing the transfer of IP to a foreign state—one which believes it lies outside this Court's jurisdiction—would ensure this Court retains the opportunity to address the merits of SUNY RF's claims.

*Third*, Defendants will not suffer significant harm if the Court grants relief. JSR is a global company with multiple revenue streams and any harm from requiring it to abide by its Agreements will be de minimis. In addition, any funds would be ordered into an interest-bearing escrow account, and JSR will receive that interest should it prevail, invalidating any alleged harm that could be caused by escrow into a non-interest-bearing account with a bond.

*Fourth*, "a bond is unnecessary where," as here, "the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." *Ferguson v. Ruane Cuniff & Goldfarb Inc.*, 2021 WL 5507028, at *2 (S.D.N.Y. Nov. 24, 2021) (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997)). As discussed, this Court could lose jurisdiction over Defendants, their assets, and SUNY RF's IP should the Court decline to enter preliminary relief.

## V.    <u>CONCLUSION</u>

For the reasons stated above, SUNY RF respectfully requests that the Court grant its motion for temporary restraining order and for preliminary injunction in full.  A proposed order is attached.

Dated: January 31, 2024

Respectfully submitted,

*/s/ Andrew R. Safranko*
Andrew R. Safranko, Esq.
LaMarche Safranko Law PLLC
Bar Roll 510803
987 New Loudon Road
Cohoes, New York 12047

Justin A. Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: 713-651-9366
Facsimile: 713-654-6666
jnelson@susmangodfrey.com

John Schiltz (*pro hac vice forthcoming*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: 206-516-3880
Facsimile: 206-516-3883
jschiltz@susmangodfrey.com

Samir Doshi (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: 212-336-8330
Facsimile: 212-336-8340
sdoshi@susmangodfrey.com

Argie Mina (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: 310-789-3100
Facsimile: 310-789-3150
amina@susmangodfrey.com

*Attorneys for Plaintiff SUNY RF*