UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THE RESEARCH FOUNDATION FOR THE STATE
UNIVERSITY OF NEW YORK,

                       Plaintiff,

v.

INPRIA CORPORATION and JSR CORPORATION,

                       Defendants.
_____

1:24-cv-120 (BKS/ML)

**Appearances:**

*For Plaintiff:*
Andrew R. Safranko
Lamarche Safranko Law PLLC
987 New Loudon Road
Cohoes, NY 12047

John E. Schiltz
Susman Godfrey L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101

Justin A. Nelson
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5000
Houston, TX 77002

Argie L. Mina
Susman Godfrey L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

Samir Doshi
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019

*For Defendants:*
Joshua Bennett
Eric W. Dittmann

Isaac S. Ashkenazi
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

Naveen Modi
Phillip W. Citroen
Paul Hastings, LLP
2050 M Street, NW
Washington, DC 20036

James J. O'Shea
John G. Powers
Mary L. D'Agostino
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.      INTRODUCTION**

Plaintiff Research Foundation for the State University of New York ("SUNY RF") initiated this action against Defendants Inpria Corporation ("Inpria") and JSR Corporation ("JSR") on January 25, 2024, asserting claims for breach of contract, correction of inventorship under 35 U.S.C. § 256, and related claims arising out of Inpria and JSR's alleged use of SUNY RF's intellectual property. (Dkt. No. 1). Presently before the Court is SUNY RF's motion for a temporary restraining order and preliminary injunction, which was filed on January 31, 2024. (Dkt. No. 24). SUNY RF's motion is fully briefed, (Dkt. Nos. 24, 62, 63), and the Court heard oral argument on March 28, 2024, (Text Minute Entry, March 28, 2024). For the following reasons, SUNY RF's motion is denied.

II. **FACTS**[1]

    A. **The Parties**

SUNY RF is a private non-profit education corporation based in Albany, New York, that works with State University of New York ("SUNY") leaders to "facilitate research and discovery by administering sponsored projects and delivering intellectual property and technology transfer services." (Dkt. No. 1, ¶¶ 1, 45). Inpria is an Oregon-based Delaware corporation "engaged in research, design, development, manufacturing, sale, and exportation of metal oxide photoresists, with an emphasis on applications for [Extreme Ultraviolet ("EUV")] semiconductor processing." (*Id.* ¶ 46). JSR is a Tokyo-based Japanese corporation that "sells materials for various industries, including but not limited to EUV photoresists for semiconductor manufacturing." (*Id.* ¶ 47). JSR "acquired Inpria as a wholly-owned subsidiary on October 29, 2021 for $514 million." (*Id.*).

    B. **Dr. Robert Brainard**

Dr. Brainard is a Professor of Nanobioscience at SUNY at Albany who researches the design, synthesis, and characterization of new molecules and polymers for use in nanotechnology. (*Id.* ¶ 90). Much of Dr. Brainard's research is focused on photoresists, "light-sensitive layers used in nearly every step in the manufacture of integrated circuits and the building of circuit boards." (*Id.*). "Dr. Brainard is the first chemist in the world to design photoresists for use in EUV Lithography," (*id.* ¶ 93), a topic of particular interest to

---

[1] The facts are taken from the complaint and the affidavits and attached exhibits the parties submitted in connection with this motion. *See J.S.G. ex rel. J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

semiconductor manufacturers attempting to fit increasingly intricate circuit board patterns onto smaller microchips, (see id. ¶¶ 90–95).

### C.  Research Agreements

SUNY RF and Inpria entered into an initial two-year Research Agreement, effective January 1, 2015 ("2015 Research Agreement"), (Dkt. No. 1-2), the term of which was extended to March 9, 2017, (Dkt. No. 1-5, at 2), and a second two-year Research Agreement, effective May 1, 2017 ("2017 Research Agreement"), (Dkt. No. 1-6), the term of which was extended to August 31, 2019, (Dkt. No. 1-7, at 2). The 2015 and 2017 Research Agreements established an arrangement between the parties to research and develop a project titled "Molecular Organometallic Resists for EUV (MORE)" (the "Project"). (Dkt. No. 1-2, at 2; Dkt. No. 1-6, at 2). Inpria agreed to fund the Project, (Dkt. No. 1-2, ¶ 3; Dkt. No. 1-6, ¶ 3), and SUNY RF agreed to carry it out with Dr. Brainard as Principal Investigator, (Dkt. No. 1-2, ¶ 1; Dkt. No. 1-6, ¶ 1).

Under the 2015 and 2017 Research Agreements, SUNY RF licensed certain intellectual property acquired through Dr. Brainard's previous research ("Prior Project IP") to Inpria for the limited purpose of completing the Project. (Dkt. No. 1-2, ¶ 9(h); Dkt. No. 1-3, ¶ 1; Dkt. No. 1-6, ¶ 9(h)). The parties agreed that SUNY RF would own all intellectual property rights generated under the Research Agreements using only SUNY "facilities or personnel" ("Foundation Inventions"), (Dkt. No. 1-2, ¶ 9(a); Dkt. No. 1-6, ¶ 9(a)), and that Inpria would likewise own all intellectual property rights generated under the Research Agreements using only Inpria "facilities and [] personnel" ("Sponsor Inventions"), (Dkt. No. 1-2, ¶ 9(f); Dkt. No. 1-6, ¶ 9(f)). The parties further agreed that SUNY RF and Inpria would jointly own all intellectual property rights generated under the Research Agreements that were not Foundation Inventions or Sponsor Inventions ("Joint IP"). (Dkt. No. 1-2, ¶ 9(e); Dkt. No. 1-6, ¶ 9(e)).

SUNY RF did not license Foundation Inventions to Inpria under the 2015 or 2017 Research Agreement. (Dkt. No. 1-2, ¶ 9(b); Dkt. No. 1-6, ¶ 9(b)). Instead, the 2015 and 2017 Research Agreements provided Inpria with exclusive 120-day options to acquire exclusive, royalty bearing licenses to Foundation Inventions, (Dkt. No. 1-2, ¶ 9(c); Dkt. No. 1-6, ¶ 9(c)), and SUNY RF's interest in Joint IP, (Dkt. No. 1-2, ¶ 9(e); Dkt. No. 1-6, ¶ 9(e)). Inpria never exercised these options. (Dkt. No. 1, at 17–18).

D.     **Pending Lawsuit**

In June 2023, JSR announced that it is being acquired in a $6.4 billion transaction by Japan Investment Corporation ("JIC"), a Japanese government-backed fund whose investments are overseen by the Japanese Ministry of Economy, Trade, and Industry. (Dkt. No. 24-4, at 2). The JIC–JSR transaction is structured as a tender offer with JIC Capital, Ltd. ("JICC"), a wholly owned subsidiary of JIC, acquiring JSR's listed shares through JICC-02, Ltd., a wholly owned subsidiary of JICC. (Dkt. No. 66-1, at 5–6). On March 18, 2024, JICC announced that it had decided to commence the tender offer on March 19, 2024, (*id.* at 1), and that the tender offer period is expected to be twenty business days, the shortest period required by law, (*id.* at 42–43), meaning that the anticipated closing date of the tender offer is April 16, 2024, (Dkt. No. 67, at 1).

"[M]onths ago," SUNY RF contacted Inpria and JSR and "the parties promptly signed a tolling and confidentiality agreement allowing for the exchange of information." (Dkt. No. 24-2, at 6). That agreement expired on January 22, 2024. (*Id.*).

Thereafter, on January 25, 2024, SUNY RF filed a complaint against Inpria and JSR asserting over 300 claims arising out of their alleged use of SUNY RF IP.[2] (Dkt. No. 1). SUNY

---

[2] "SUNY RF IP" includes all Prior Project IP, Foundation Inventions, and SUNY RF's interest in any Joint IP, as well as the "Challenged Patents" and all other SUNY RF intellectual property disclosed to Inpria or JSR during the terms of the 2015 and 2017 Research Agreements. (Dkt. No. 24-2, at 9). The "Challenged Patents" are "issued United States patents assigned to and/or obtained by Inpria, its employees and/or agents, which omitted Dr. Brainard and/or his co-

5

RF contends that Inpria "breached the 2015 and 2017 Research Agreements by failing to name Dr. Brainard and his coinventors as inventors or co-inventors of [numerous] patents and patent applications that Inpria has claimed as its own but which are plainly Prior Project IP or Foundation Inventions under the express terms of the Research Agreements, by failing to assign those patent and patent applications to SUNY RF, and by failing to acquire a license to use or otherwise commercially exploit such Prior Project IP or Foundation Inventions." (*Id.* ¶ 27).

On January 31, 2024, SUNY RF filed the instant motion for a temporary restraining order and preliminary injunction ordering Inpria and JSR to (1) freeze prosecution of any patent applications and not initiate or file additional patent applications incorporating SUNY RF IP without the consent of SUNY RF; (2) cease licensing, either directly or indirectly, the Challenged Patents, including but not limited to JIC; (3) cease assigning or transferring, either directly or indirectly, the Challenged Patents, as well as any other intellectual property based in whole or in part on SUNY RF IP, to any party, including but not limited to Tokyo Electron Limited or JIC; (4) cease practicing (including making, using, exporting, or selling) SUNY RF IP and comply with the contractual agreements not to use SUNY RF IP; and (5) contribute into an interest-bearing escrow account either (i) $257 million if Inpria and JSR are enjoined from practicing SUNY RF IP or (ii) $2.39 billion if Inpria and JSR are not enjoined from practicing SUNY RF IP. (Dkt. No. 24-2, 9–10).

---

inventors (while at and under an obligation of assignment to SUNY RF) as sole or joint inventors. The Challenged Patents include U.S. Patent Nos. 9,310,684 (the "'684 Patent"); 10,025,179 (the "'179 Patent"); 10,416,554 (the "'554 Patent"); 10,732,505 (the "'505 Patent"); 11,754,924 (the "'924 Patent"); 10,775,696 (the "'696 Patent"); 11,537,048 (the "'048 Patent"); 11,809,081 (the "'081 Patent"); 10,228,618 (the "'618 Patent"); 11,740,559 (the "'559 Patent"); 11,187,986 (the "'986 Patent"); 10,627,719 (the "'719 Patent"); 11,480,874 (the "'874 Patent"); 9,823,564 (the "'564 Patent"); 11,693,312 (the "'312 Patent"); 10,642,153 (the "'153 Patent"); 11,392,029 (the "'029 Patent"); 11,500,284 (the "'284 Patent"); 11,673,903 (the "'903 Patent"); 10,787,466 (the "'466 Patent"); 10,975,109 (the "'109 Patent"); 11,098,070 (the "'070 Patent"); 11,392,028 (the "'028 Patent"); 11,300,876 (the "'876 Patent"); and 11,868,046 (the "'046 Patent"), as well as the children and foreign counterparts of these Patents, whether granted and issued, pending, or yet-to-be-filed children and foreign counterparts of these Patents." (Dkt. No. 1, at 29–30).

6

### III.     DISCUSSION

#### A.     Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014) (summary order); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). In general, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable harm in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions, that the balance of hardships tips *decidedly* in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*, 883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d

7

Cir. 2012)). "A heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

Inpria and JSR argue that a heightened standard applies here because a preliminary injunction would provide SUNY RF with "the same permanent injunctive relief requested in the Complaint" and "would likely shut Inpria down." (Dkt. No. 62, at 12–13). The Court need not decide the applicable standard, however, in light of its ruling that SUNY RF has failed to demonstrate irreparable harm.

**B.     Analysis**

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied," *Rodriguez*, 175 F.3d at 234. "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

SUNY RF argues that JSR has "indicated an 'intent to frustrate any judgment on the merits,'" (Dkt. No. 24-2, at 23 (quoting *Shamrock Power Sales, LLC v. Scherer*, No. 12-cv-8959, 2016 WL 6102370, at *2, 2016 U.S. Dist. LEXIS 144773, at *5 (S.D.N.Y. Oct. 18, 2016))), and that SUNY RF will suffer irreparable harm when JSR "consummate[s] a tender offer transaction that will leave control of SUNY RF IP (and the decision to pay a judgment) in the hands of the Japanese government," (Dkt. No. 63, at 11). Inpria and JSR respond that that the JIC–JSR transaction "does not mean that any Inpria 'assets' will be 'transferred' or 'dissipate'" because the transaction involves a transfer of shares, not assets, and that no irreparable harm exists in any event because "[r]egardless of where a patent owner is located, U.S. courts retain jurisdiction over correction of inventorship claims pertaining to U.S. patents." (Dkt. No. 62, at 25–26).

As SUNY RF notes, "federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transfer[ring assets] out of the jurisdiction.'" *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) (quoting *Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980)). The question facing the Court, therefore, is whether SUNY RF has shown that Inpria and JSR intend to frustrate a judgment on the merits in this case.

SUNY RF's cases form a useful guide. In *Feit & Drexler*, the Second Circuit found that injunctive relief was properly awarded because a finding of irreparable harm was supported by evidence that the defendant had engaged in "numerous" and "substantial efforts to hide and secrete assets," including "[the defendant's] bond purchases and Swiss bank accounts, along with her repeated sworn testimony that she had no such assets." 760 F.2d at 416 (citing 42 B.R. 355, 359 (S.D.N.Y. 1984)). In *Nastro v. D'Onofrio*, the defendant admitted that he did not have assets to pay the plaintiff's judgment and there was "evidence suggesting that he transferred [certain

9

assets] off-shore for the purpose of avoiding [the plaintiff's] judgment." 263 F. Supp. 2d 446, 457, 459 (D. Conn. 2003). In *Shamrock Power Sales*, the evidence revealed that the defendants had failed to comply with a contempt order directing them to cease business operations and deposit sums in escrow. 2016 WL 6102370, at *10, 2016 U.S. Dist. LEXIS 144773, at *31. In *New York Land Co. v. Republic of Philippines*, two defendants, former President of the Philippines Ferdinand Marcos and his wife Imelda Marcos, had defaulted and an existing temporary restraining order had prevented an arrangement to sell certain of their assets. 634 F. Supp. 279, 288 (S.D.N.Y. 1986). Finally, in *Republic of Panama v. Air Panama Internacional, S.A.*, which was litigated amidst a political struggle in the Republic of Panama, certain individuals attempted to intervene in the case on behalf of the unrecognized General Manuel Antonio Noriega–Manuel Solis Palma regime and exert control over the defendant's assets, which, in light of the political struggle, could have been "irretrievably dissipated and lost." 745 F. Supp. 669, 670, 674 (S.D. Fla. 1988).[3]

In this case, SUNY RF points to an announcement purportedly "indicating [JSR's] view that it is not subject to the jurisdiction of U.S. courts." (Dkt. No. 24-2, at 23 (citing Dkt. No. 24-6)). But, as Inpria and JSR note, the relevant statements appear to be routine disclosures made by foreign issuers seeking exemption from the requirements of U.S. securities laws. (Dkt. No. 62, at 24). And suggesting that attempts to *comply* with certain laws reveal an intention to *evade* others is unpersuasive. SUNY RF also points to JIC's "steadfast[] refus[al]" to stipulate to "accept the Court's jurisdiction, not assert sovereign immunity, and pay a judgment should the Court order it to do so." (Dkt. No. 63, at 12 (citing Dkt. Nos. 62-24, 62-25)). But, as Inpria and JSR argued at

---

[3] In *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, which SUNY RF also cites, the court observed that injunctive relief may be granted where the defendant intended to frustrate a judgment, but the court did not engage with the issue as it was not relevant to the court's analysis. 342 F. Supp. 2d 124, 126 (E.D.N.Y. 2004).

the March 28, 2024 hearing, declining to provide stipulations is not evidence of an intention to frustrate a judgment.

SUNY RF has presented no evidence that either Inpria or JSR has made any effort to hide or secrete assets, as in *Feit & Drexler*. Nor has SUNY RF documented any steps Inpria or JSR has taken to transfer ownership of assets offshore for the purpose of avoiding a judgment, as in *Nastro*. There is no suggestion that Inpria or JSR has failed to comply with a court order like the defendants in *Shamrock Power Sales*. And, of course, unlike in *New York Land*, neither Inpria nor JSR is in default. Therefore, SUNY RF's argument that Inpria and JSR intend to frustrate a judgment on the merits in this case is speculative and conclusory. Indeed, SUNY RF seems to be asking the Court to infer that Inpria and JSR intend to frustrate a judgment in this case from the mere fact that the JIC–JSR transaction is an international transaction involving a sovereign wealth fund. (*See* Dkt. No. 24-2, at 24–25). And the current record does not support SUNY RF's argument that the JIC–JSR transaction is a "jurisdictional gambit." (*Id.* at 23).[4]

As an initial matter, SUNY RF has not tied JIC's decision to acquire JSR to JSR's ownership of Inpria. SUNY RF's submissions reveal that JSR is a "semiconductor materials giant," (Dkt. No. 24-11, at 3), that "holds a roughly thirty percent share of the global market for photoresists," (Dkt. No. 24-12, at 2), and supplies photoresists to international "chipmakers such as Samsung Electronics, Taiwan Semiconductor Manufacturing Company, and Intel," (Dkt. No.

---

[4] At the March 28, 2024 hearing, SUNY RF argued, for the first time, that the Court should find irreparable harm based on JSR pledging its assets to a third party as collateral for a loan. This argument was not raised prior to the hearing even though it is based on information that has been publicly available since June 26, 2023. (*See* Dkt. No. 24-68, at 10 ("Of the assets to be provided as security for the Bank Loan, the assets held by [JSR] and its consolidated subsidiaries will be provided as security after the Squeeze-Out Procedures are completed.")). In any event, the Court is unpersuaded. SUNY RF has not explained how pledging assets in connection with a tender offer is akin to transferring assets in any case or how the circumstances or mechanics of the JSR asset pledge present a non-speculative risk of any dissipation—much less any imminent dissipation—of assets in this case. SUNY RF argued that ownership of JSR's assets will transfer to the Japanese government in the event of a default. But without any evidence that a default is likely, SUNY RF's new argument is as speculative as its original arguments.

24-4, at 2). Indeed, while JSR "acquired Inpria as a wholly-owned subsidiary" in 2021 for $514 million, (Dkt. No. 1, ¶ 47), JIC is acquiring JSR in a deal worth $6.4 *billion*, (Dkt. No. 24-4, at 2). The nearly seventy-page June 26, 2023 press release issued by JIC announcing the JIC–JSR transaction references Inpria only two times, and, even then, only as an example of the "strategic investments" JSR has made in its digital solutions business. (Dkt. No. 24-68, at 22). And of the numerous articles cited by SUNY RF discussing the JIC–JSR transaction, (Dkt. Nos. 24-4, 24-5, 24-9, 24-10, 24-11, 24-12, 24-13, 24-14, 24-15), only one mentions Inpria at all, (Dkt. No. 24-15). Therefore, while JSR undoubtedly derives some value from Inpria, SUNY RF's own evidence suggests that most of JSR's value is independent of Inpria. Absent any showing that JIC's decision to acquire JSR was animated by JSR's ownership of Inpria, SUNY RF's theory that the JIC–JSR transaction is an effort "to take SUNY RF IP and run," (Dkt. No. 24-2, at 8), is speculative and conclusory and provides an insufficient basis on which to establish "actual and imminent" harm, *New York ex rel. Schneiderman*, 787 F.3d at 660 (quoting *Forest City Daly Hous., Inc.*, 175 F.3d at 153).

Even if Inpria did factor into JIC's decision to acquire JSR, the current record still does not support SUNY RF's theory. The Court does not doubt that "consummation of the JIC–JSR transaction is 'extremely important' to the Japanese government." (Dkt. No. 24-2, at 23 (citing Dkt. No. 24-4)). But to find SUNY RF's theory persuasive one must conclude that JIC intends to extricate JSR and its assets from international markets. And, if anything, the evidence submitted by SUNY RF suggests that the JIC–JSR transaction is part of a broader push by the Japanese semiconductor industry to do just the opposite.

The evidence indicates that the Japanese government has introduced certain "support measures [that] aim to maintain Japan's presence in the global semiconductor ecosystem and

12

induce additional private sector investment." (Dkt. No. 24-12, at 2). "The Japanese government's semiconductor strategy emphasizes strengthening Japan's next-generation semiconductor technology base through international collaboration"—including with "technology-driven nations" like the United States. (*Id.* at 3). And, according to former Japanese Minister of Economy, Trade, and Industry Yasutoshi Nishimura, the JIC–JSR transaction "will strengthen Japan's global competitiveness in semiconductor materials pivotal to the production and development of cutting-edge chips." (Dkt. No. 24-4, at 2).

In JIC's June 26, 2023 press release, Representative Director Osamu Itabashi states that JIC was "established to generate a virtuous cycle of risk capital to support next-generation industries in Japan" by "promot[ing] open innovation." (Dkt. No. 24-68, at 7). He notes that JSR's "goal is to maintain and expand its share of the global market" and that recent initiatives "such as making Inpria . . . a wholly-owned subsidiary" are "in line with this management policy." (*Id.* at 12–13). Mr. Itabashi explains that, after the JIC–JSR transaction, JICC "will be able to support the planning and execution of global growth strategies." (*Id.* at 16). Current JSR Chief Executive Officer Eric Johnson similarly notes that JIC's "charter is to support . . . [the] global competitiveness of Japan[ese] industry," (Dkt. No. 24-16, at 3), and that the JIC–JSR transaction will "improve the efficiency of [JSR's] research and development activity and . . . drive scale in order for [JSR] to be truly competitive globally," (Dkt. No. 24-15, at 3). He also states that JSR "aims to relist in several years." (*Id.*). Against this backdrop, it seems highly likely that JIC hopes to *increase* JSR's "thirty percent share of the global market for photoresists," (Dkt. No. 24-12, at 2)—and almost inconceivable that JIC intends to *diminish* it. This cuts firmly against SUNY RF's theory that Inpria and JSR—and JIC—intend to transfer ownership of Inpria and JSR's assets to frustrate a judgment in this case.

SUNY RF's theory is especially weak with respect to SUNY RF IP assets. Inpria and JSR have submitted a declaration by Shogo Ikeuchi, President and Chief Executive Officer JICC. (Dkt. No. 62-3, ¶ 3). In the declaration, Mr. Ikeuchi states ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ SUNY RF argues ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ SUNY RF provides no evidence in support of this argument, however, which is directly contradicted by the record and therefore entirely unpersuasive.

Assuming, arguendo, that a nefarious intention does lurk beneath the surface of the JIC–JSR transaction, SUNY RF also has not explained in a non-speculative manner how JIC's status as a sovereign wealth fund raises the specter of irreparable harm. SUNY RF has stated that JIC is a "Japanese government-backed fund." (Dkt. No. 24-2, at 6). But SUNY RF has neither demonstrated that JIC constitutes a foreign sovereign nor distinguished the present case from those in which courts in this circuit and in others have found that certain actions against foreign sovereigns—including sovereign wealth funds—fall within the scope of the commercial activity exception to the Foreign Sovereign Immunity Act of 1976. *See, e.g.*, *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 106–07 (2d Cir. 2016); *Intel Corp. v. Commonwealth Sci. & Indus. Rsch. Organisation*, 455 F.3d 1364, 1369–71 (Fed. Cir. 2006).

14

As an independent theory of irreparable harm, SUNY RF also argues that "when [Inpria and JSR] 'sell or transfer [SUNY RF's] intellectual property'" SUNY RF "will be 'deprived of ownership rights and may not be able to undo a transfer,'" (Dkt. No. 24-2, at 24 (quoting *Roederer v. Treister*, 2 F. Supp. 3d 1153, 1164 (D. Or. 2014))), and will suffer "the loss of reputation, good will, and business opportunities," (*id.* at 25). Again, the current record does not support SUNY RF's argument that a transfer of SUNY RF IP is likely. (*See, e.g.*, Dkt. No. 62-3, ¶ 9). In any event, Inpria and JSR point out that "[b]y registering a patent in the United States Patent and Trademark Office, a party residing abroad purposefully avails itself of the benefits and protections patent registration in this country affords," (Dkt. No. 62, at 25–26 (quoting *Nat'l Patent Dev. Corp. v. T.J. Smith & Nephew*, 877 F.2d 1003, 1009 (D.C. Cir. 1989))), and "[e]ven if a patent owner has not designated a person on whom 'process or notice' may be served, 'the United States District Court for the Eastern District of Virginia shall have jurisdiction' to hear [a] correction of inventorship claim,'" (*id.* at 26 (quoting 35 U.S.C. § 293)).

Moreover, SUNY RF has not adequately explained what harm to its reputation, good will, or business opportunities it is alleging or why injunctive relief is necessary to prevent such harm. (Dkt. No. 24-2, at 25). In *Roederer*, which SUNY RF cites, the plaintiff company's business was licensing the software at issue and there was evidence of a plan to dilute the plaintiff individual's share in the company. 2 F. Supp. 3d at 1161. There was also evidence that the plaintiff company's customers would be irreparably harmed without software updates, which the defendant was refusing to provide, leading to an adverse impact to the company's relationship with its clients. *Id.* By contrast, the evidence in this case does not indicate that SUNY RF has ever attempted to commercialize the intellectual property at issue except to the extent that SUNY RF offered to license it to Inpria, (*see, e.g.*, Dkt. No. 1-2, ¶ 9(c); Dkt. No. 1-6,

15

¶ 9(c); Dkt. No. 1-2, ¶ 9(e); Dkt. No. 1-6, ¶ 9(e)), which itself suggests that SUNY RF is "willing to forgo its patent rights for compensation" and, consequently, that any harm suffered can be remedied by money damages. *See High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("[T]he evidence shows that HTMI offered a license to New Image, so it is clear that HTMI is willing to forgo its patent rights for compensation."). SUNY RF's second theory of irreparable harm is therefore, like its first, unavailing. *See Veramark Technologies., Inc. v. Bouk*, 10 F. Supp. 3d 395, 401–05 (W.D.N.Y. 2014) (finding that the party moving for a preliminary injunction had failed to demonstrate irreparable harm because the alleged irreparable harms at issue—the threat to "customer relationships and goodwill" and the loss of a "unique" employee—were not supported by facts in the record).

Finally, the Court notes that injunctive relief is "generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Consequently, "[d]elay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action," *id.* (citing *Gillette Co. v. Ed Pinaud, Inc.*, 178 F.Supp. 618, 622 (S.D.N.Y.1959)), although "good-faith attempts at settlement and investigations are acceptable justifications for delay," *Goat Fashion Ltd. v. 1661, Inc.*, No. 19-cv-11045, 2020 WL 5758917, at *6, 2020 U.S. Dist. LEXIS 178636, at *16 (S.D.N.Y. Sept. 28, 2020). At the March 28, 2024 hearing, SUNY RF indicated that it became aware of alleged breaches of the 2015 and 2017 Research Agreements in October 2022, at which point Inpria was already owned by JSR. (Dkt. No. 1, ¶ 47). But SUNY RF did not contact Inpria or JSR or enter into "a tolling and confidentiality agreement" with either party until after JSR's June 2023 announcement of the JIC–JSR transaction. (Dkt. No. 24-2, at 6). Moreover, the record includes evidence, such as a 2019 Dr. Brainard presentation that references

Inpria twenty-two times, that SUNY RF has been aware of Inpria's activities for at least five years. (Dkt. No. 62-9). To the extent SUNY RF is relying on harm to its reputation, good will, or business opportunities for a showing of irreparable harm, its delay in bringing this motion significantly undermines its claim.

In sum, SUNY RF has not, on the record before the Court, met its burden of demonstrating irreparable harm because the harm it alleges is speculative and conclusory—not "actual and imminent." *New York ex rel. Schneiderman*, 787 F.3d at 660 (quoting *Forest City Daly Hous., Inc.*, 175 F.3d at 153). There is simply no evidence from which the Court can conclude that Inpria and JSR intend to frustrate a judgment in this case or that SUNY RF has established irreparable harm from a loss of ownership rights or of reputation, good will, or business opportunities. Because a "finding of no showing of irreparable harm is dispositive," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007), the Court does not reach the question of likelihood of success on the merits, *see Knowles v. U.S. Coast Guard*, 924 F. Supp. 593, 605 (S.D.N.Y. 1996) (declining to address the likelihood of success on the merits where the plaintiffs failed to demonstrate the probability of irreparable harm in the absence of a preliminary injunction). SUNY RF's motion for a temporary restraining order and preliminary injunction is denied.

In light of the Court's ruling on SUNY RF's motion for a temporary restraining order and preliminary injunction, Inpria and JSR's related motion to strike certain portions of SUNY RF's submissions is denied as moot.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that SUNY RF's motion for a temporary restraining order and preliminary injunction, (Dkt. No. 24), is **DENIED**; and it is further

17

**ORDERED** that Inpria and JSR's related motion to strike certain portions of SUNY RF's submissions, (Dkt. No. 65), is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated: March 29, 2024
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge