**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

THE RESEARCH FOUNDATION FOR THE STATE
UNIVERSITY OF NEW YORK,

                                                                    1:24-cv-120 (BKS/ML)

                                        Plaintiff,

v.

INPRIA CORPORATION and JSR CORPORATION,

                                        Defendants.

**Appearances:**

*For Plaintiff:*
Andrew R. Safranko
Lamarche Safranko Law PLLC
987 New Loudon Road
Cohoes, NY 12047

John E. Schiltz
Susman Godfrey L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101

Justin A. Nelson
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5000
Houston, TX 77002

Samir Doshi
Susman Godfrey L.L.P.
One Manhattan West – 50th Floor
New York, NY 10019

*For Defendants:*

Eric W. Dittmann
Isaac S. Ashkenazi
Joshua M.Bennett
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

1

Naveen Modi
Phillip W. Citroen
Paul Hastings, LLP
2050 M Street, NW
Washington, DC 20036

John G. Powers
Mary L. D'Agostino
Hancock Estabrook, LLP
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Research Foundation for the State University of New York ("SUNY RF") brings

this action against Defendants Inpria Corporation and JSR Corporation asserting claims for

breach of contract, correction of inventorship under 35 U.S.C. § 256, and related claims arising

out of Inpria and JSR's alleged use of SUNY RF's intellectual property. (Dkt. No. 86). Presently

before the Court is Defendants' Motion for Partial Judgment on the Pleadings under Federal Rule

of Civil Procedure 12(c). (Dkt. No. 96). Defendants' motion is fully briefed. (Dkt. Nos. 96-16,

101, 104). For the following reasons, Defendants' motion is denied.

## II.    FACTS[1]

### A.    The Parties

SUNY RF is a private non-profit education corporation. (Dkt. No. 86, at 23). SUNY RF

works with the academic and business leadership of The State University of New York

---

[1] The facts are drawn from the Plaintiff's First Amended Complaint and its exhibits. (Dkt. No. 86). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). The Amended Complaint is extensive, at 462 pages without accounting for

2

("SUNY") campuses to "facilitate research and discovery by administering sponsored projects and delivering intellectual property and technology transfer services[.]" (*Id.* at 5). SUNY RF is "the exclusive intellectual property management organization for SUNY and the assignee of its intellectual property." (*Id.*).

Inpria is an Oregon-based corporation "engaged in research, design, development, manufacturing, sale, and exportation of metal oxide photoresists, with an emphasis on [Extreme Ultraviolet ("EUV")] semiconductor processing." (*Id.* at 23). JSR is a Japanese corporation which acquired Inpria as a wholly-owned subsidiary on October 29, 2021, for $514 million. (*Id.* at 23-24). JSR "sells materials for various industries, including but not limited to EUV photoresists for semiconductor manufacturing." (*Id.* at 24).

### B.    Dr. Robert Brainard

Dr. Robert Brainard is a Professor in the Department of Nanoscale Science & Engineering at SUNY at Albany, in the College of Nanotechnology, Science, and Engineering (CNSE). (*Id.* at 5). Dr. Brainard "is a leader and early pioneer in the field of photoresists," and in 1998 became "the first chemist in the world to design photoresists for use in [EUV] lithography. (*Id.*). Photolithography is the process of using light to create patterns on silicon wafers to produce circuit boards on microchips. (*Id.* at 32). Photoresists are light-sensitive materials that interact with light to produce a pattern on the silicon wafer after development. (*Id.*). EUV Lithography uses shorter, EUV wavelengths to produce higher resolution patterns. (*Id.*). Higher resolution patterns are important in the semiconductor industry, in order to fit more intricate circuit board patterns onto smaller microchips. (*Id.*).

---

exhibits.(*See* Dkt. No. 86). For the sake of efficiency, the Court recounts only those facts necessary for resolution of the motion and cites to the Amended Complaint by reference to the page numbers generated by the Court's CM/ECF system.

Since Dr. Brainard joined SUNY as a professor in 2005, he and his students have designed, synthesized, and characterized new materials for photoresists. (*Id.*). In 2011, Dr. Brainard "embarked on a project . . . to design and synthesize organometallic compounds containing transition or main group metallic elements," which are then evaluated lithographically for use as EUV photoresist materials. (*Id.* at 33). Plaintiff refers to these metal oxide photoresists as Molecular Organometallic Resists for EUV ("MORE"). (*Id.* at 6). "To date, over a thousand compounds have been synthesized and evaluated lithographically." (*Id.* at 33).

### C.    Inpria Joins SEMATECH[2]

In 2003, CNSE partnered with "SEMATECH (**Se**miconductor **Ma**nufacturing **TECH**nology)." (*Id.* at 31). SEMATECH was a consortium "aimed at cooperation between companies, universities, regional government, and others in order to foster technology innovation in the semiconductor industry." (*Id.*). SEMATECH "had access to laboratories and other facilities in Albany," with its headquarters at CNSE. (*Id.*). SUNY RF is the successor to and owner of all right, title, and interest in SEMATECH and its intellectual property. (*Id.*).

In 2012, Inpria "was just getting started when it was accepted" to join SEMATECH. (*Id.* at 8). Inpria joined SEMATECH's "Resist Materials and Development Center" to collaborate on "critical issues for resists in [EUV] lithography[.]" (*Id.*). Previously, according to Plaintiff, "Inpria had focused its research on another type of photoresist—those made out of hafnium— which . . . were inferior to" the MORE photoresists invented by Dr. Brainard. (*Id.*).

SUNY's collaboration with Inpria regarding MORE "began no later than 2012 when then-Inpria CEO Andrew Grenville began reaching out [regarding MORE] to Dr. Brainard" and his team. (*Id.* at 48-49). This collaboration took place prior to the effective dates of the parties'

---

[2] In 2015, SEMATECH was merged into SUNY Polytechnic Institute. (Dkt. No. 86, at 31).

Research Agreements, and "took the form of email, telephonic, and in-person communications, both one-on-one and through SEMATECH, during which Grenville and the other alleged named inventors at Inpria became aware of Dr. Brainard's MORE inventions." (*Id.* at 49). Dr. Brainard made confidential presentations to SEMATECH members, including Inpria. (*Id.* at 54-55). Two of these presentations were given on May 1, 2012 and June 14, 2013, during which Dr. Brainard described his work surrounding "revolutionary new photoresists based on [MORE]." (*Id.*). On May 20, 2013, Dr. Brainard's then-advisee (and now Inpria principal chemist) Brian Cardineau presented his doctoral thesis titled "Novel Resist Systems for EUV Lithography." (*Id.* at 55). SUNY RF alleges Inpria "had access to and, on information and belief, obtained this doctoral thesis presentation." (*Id.*). SUNY RF and Inpria's collaboration was "subject to a duty of confidentiality, including for example, as required of all SEMATECH members, as understood by the parties, and pursuant to a non-disclosure agreement effective as of June 21, 2013." (*Id.* at 49).

## D.    The 2015 Research Agreement

"In or around October 2014," Inpria and Grenville "sought out Dr. Brainard and his team of researchers to learn from their prior research and to conduct additional research into MORE that could be shared with Inpria." (*Id.* at 9). Grenville told Dr. Brainard at that time that their "high level goals [were] well aligned," and that they would "crack this nut and only with the integrated team capable of doing so." (*Id.*). Grenville said he was "intent on doing so under working relationships that [were] fair and equitable all around." (*Id.*).

Effective January 1, 2015, Inpria and Grenville entered into a two-year Research Agreement with SUNY RF ("the 2015 RA"). (*Id.*). The 2015 RA "Project," within the meaning of the agreement, was "a research and development project entitled 'Molecular Organometallic

5

Resists for EUV (MORE)'[.]" (Dkt. No. 86-2, at 2). Under the terms of the 2015 RA, Dr.

Brainard was the principal investigator supervising the Project, and Grenville was designated as

Inpria's principal liaison. (Dkt. No. 86, at 9). SUNY RF was the "Foundation," and Inpria was

the "SPONSOR." (Dkt. No. 86-2, at 2). Inpria agreed "to cooperate in executing such

documents, render such assistance, and take such other action as [SUNY RF] may reasonably

request to apply for, register, perfect, confirm, and protect the ownership rights set forth" under

section 9 of the 2015 RA. (Dkt. No. 86, at 40).

The 2015 RA provided certain definitions and terms regarding the parties' use of their

respective intellectual property. (*See* Dkt. 86-2, at 4-6). Pursuant to the 2015 RA, SUNY RF held

title to all "Foundation Inventions," which the agreement defined as "all Intellectual Property

Rights which are generated, conceived, or reduced to practice during the conduct of work under

[the] Agreement utilizing facilities or personnel of [SUNY RF], SUNY Poly or SUNY

exclusively."[3] (*Id.* at 4). "No license or other rights in Foundation Inventions" were given by

SUNY RF, "except as specifically provided" by the 2015 RA. (*Id.*). In section 9(c) of the 2015

RA, SUNY RF gave Inpria "an exclusive [120] day option to acquire an exclusive, royalty

bearing, license to Foundation Inventions." (*Id.* at 4-5). If Inpria wished to exercise that option,

the parties were to "negotiate a mutually acceptable license agreement." (*Id.* at 5). The 2015 RA

"was binding and inured to the benefit of the Parties to the agreement and to their respective

---

[3] The 2015 RA defined "INTELLECTUAL PROPERTY RIGHTS" as:

> [A]ll industrial and other intellectual property rights comprising or relating to: (a) patents; (b) trademarks; (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, Including copyrights and copyrightable works, software and firmware, data, data files, and databases and other specifications and documentation; (d) know how and/or trade secrets; and (e) all industrial and other intellectual property rights, and all rights, interests and protections that are associated with, equivalent or similar to, or required for the exercise of, any of the foregoing, however arising, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights or forms of protection pursuant to the laws of any jurisdiction throughout in any part of the world.

(Dkt. No. 86, at 34 (citing Dkt. No. 86-2, at 6).

successors or assigns." (*Id.* at 36 (citing Dkt. No. 86-2, at 6)). The parties "expressly agreed SUNY RF granted 'no license or other rights in Foundation Inventions to any of its successors, such as JSR." (*Id.* at 37 (quoting Dkt. No. 86-2, at 4)).

The 2015 RA also identified certain "Prior Project IP," which the parties listed in Exhibit C attached to the agreement. (*See* Dkt. Nos. 86, at 33-34; 86-2, at 5, 27). The Prior Project IP included several projects related to MORE. (*See id.*). SUNY RF granted Inpria a license to "use the Prior Project IP to carry out the Project." (Dkt. No. 86-2, at 5). "SUNY RF did not grant Inpria a license to use the Prior Project IP for any purpose other than carrying out the Project." (Dkt. No. 86, at 35).

Under the 2015 RA, the Parties also agreed that SUNY RF and Inpria would "hold joint title to all Intellectual Property Rights generated, conceived, or reduced to practice during the conduct of work" under the agreement that were "not Foundation Inventions or SPONSOR[4] Inventions[.]" (*Id.* at 38 (quoting Dkt. No. 86-2, at 5)). These intellectual property rights were referred to collectively as "Joint IP." (*Id.*). SUNY RF claims that this section of the agreement "created an automatic assignment, transfer, and vesting of legal title to SUNY RF of an undivided equal part or share of all Intellectual Property Rights constituting Joint IP[.]" (*Id.* at 38-39). As with the Foundation Inventions, Inpria was given "an exclusive 120-day option to acquire an exclusive, royalty bearing license' to SUNY RF's interest in any Joint IP[.]" (*Id.* at 39).

The Parties amended the agreement three times: once to disclose the Prior Project IP listed in Exhibit C of the 2015 RA, (*id.* at 35-36), the second time to include a list of tasks and

---

[4] "SPONSOR Inventions" were defined as "INTELLECTUAL PROPERTY RIGHTS which were generated, conceived, or reduced to practice during the conduct of work under the 2015 SRA "utilizing [Inpria] facilities and [Inpria] personnel exclusively." (*Id.* at 39 n.7 (citing Dkt. No. 86-2, at 5)).

milestones and arrange the provision of materials and equipment, (*id.* at 40-41), and a third time

to extend the 2015 SRA to March 9, 2017, (*id.* at 41).

### E.    The 2017 Research Agreement

The Parties entered into a subsequent agreement, the 2017 Research Agreement ("2017

RA"), effective May 1, 2017. (*Id.* at 41). According to SUNY RF, "[a]s relevant here," the terms

of the 2017 RA were the same as those of the 2015 RA. (*Id.*). The list of Prior Project IP "was

inclusive of the list of Prior Project IP in Exhibit C to the 2015 [RA]," but Exhibit C to the 2017

RA "included additional SUNY RF Prior Project IP." (*Id.* at 41). The 2017 RA, like the 2015

RA, protects "Intellectual Property Rights" comprising "Prior Project IP," (*id.* at 43),

"Foundation Inventions," (*id.* at 44-45), and "Joint IP," (*id.* at 45-47). The 2017 RA also granted

Inpria a right to exercise options to acquire a license to the Foundation Inventions and Joint IP.

(*Id.* at 44-47). The Parties amended the 2017 RA once, effective April 1, 2019, to extend the

agreement's term until August 31, 2019. (*Id.* at 42).

### F.    Inpria's Alleged Breach

"[F]or several years, from January 1, 2015 to August 31, 2019, SUNY RF and Dr.

Brainard and his researchers" carried out the agreed-upon projects, "researching and developing

MORE photoresists, and methods concerning the same, for use with EUV lithography[.]" (*Id.* at

11). SUNY RF "provided Inpria access to SUNY RF's inventions and intellectual property for

the limited purpose of completing the Research Projects and for no other purpose." (*Id.*). Dr.

Brainard and his researchers "provided at least monthly reports of their findings to Inpria and

attended countless meetings and phone calls with Inpria scientists and business executives during

which Dr. Brainard and the SUNY RF team relayed their breakthrough research and

development concerning MORE materials and methods." (*Id.*). The Amended Complaint

contains myriad examples of confidential communications SUNY RF provided to Inpria, including invention disclosure reports (*see, e.g., id.* at 52), confidential presentations (*see, e.g., id.* at 54-55), the "Scope of Work" attachments to its 2015 and 2017 RAs (*see, e.g., id.* at 57, 179-80), and confidential research reports (*see, e.g., id.* at 58-59).

In June 2015, "Andrew Grenville told Dr. Brainard not to share certain MORE research with another corporation on promise that such research, development, and invention was going to be 'targeted together' by SUNY RF and Inpria, who were very 'much aligned,' and so the third-party could not reproduce and claim such invention itself without SUNY RF[.]" (*Id.* at 458). "Inpria officers and employees like Inpria CEO Andrew Grenville also repeatedly urged and assured Dr. Brainard, his research team, and SUNY RF to put their trust and confidence in Inpria, including by stating that the relationship would be "based on mutual trust[.]" (*Id.* at 415).

Inpria did not exercise any of its options under either the 2015 or the 2017 RAs to acquire a license to the Foundation Inventions or Joint IP, "or to assume control over prosecution of such patents and related patent applications." (Dkt. No. 86, at 37, 39, 44, 46). SUNY RF did not grant Inpria a license to use the Prior Project IP for any purpose other than carrying out the Project. (*Id.* at 35, 43). However, SUNY RF alleges that during this "nearly five-year project," Inpria had "secretly been incorporating SUNY RF's Prior Project IP, Foundation Inventions, and/or Joint IP into both Inpria's commercial products and methods and patent applications that Inpria had filed around the world." (*Id.* at 11). Inpria never disclosed to SUNY RF that it had been incorporating SUNY RF's IP and inventions into its commercial products and patent applications. (*Id.*).

SUNY RF alleges that Inpria has "***benefited massively*** from SUNY RF's" IP concerning MORE. (*Id.* at 18). "In July 2017, Inpria announced that it had raised $23.5 million in Series B funding, which it intended to use 'to complete its pilot manufacturing facility and to commence

commercial production.'" (*Id.*). And in February 2020, "Inpria announced that it had raised $31 million in Series C funding," which it attributed "to its belief that its 'EUV photoresists enable semiconductor manufacturers to realize the full potential of EUV lithography[.]'" (*Id.*). At the same time, Inpria reported it had "recently brought online its high-volume manufacturing plant to support the initial production ramp for customers." (*Id.*).

### G.    JSR Acquires Inpria

JSR acquired Inpria as a wholly-owned subsidiary on October 29, 2021, acquiring all shares and voting rights of Inpria.[5] (*Id.* at 451). A September 17, 2021 press release regarding JSR's acquisition of Inpria reported that "Inpria material solutions provide the performance to significantly reduce the cost of EUV patterning for the rapidly growing fleet of EUV scanners in the field." (*Id.* at 228-29).

Inpria and JSR "hired many of Dr. Brainard's former graduate students and researchers from his MORE program," including Brian Cardineau, and "included them on the Research Projects while simultaneously filing the Challenged Patents and commercializing the research and technology owned and disclosed by SUNY RF." (*Id.* at 12). SUNY RF alleges that Inpria and JSR "failed to establish an ethical wall or information barrier protocol" to prevent the exchange of SUNY RF's information from former graduate students and researchers to Inpria's and JSR's teams "working to commercialize MORE technology." (*Id.*).

In October 2022, Inpria filed a patent infringement claim against Lam Research Corporation, "asserting" in its complaint and amended complaint that Inpria "is 'the world leader in cutting edge metal oxide photoresist design, development and manufacturing, with an

---

[5] Elsewhere in the Amended Complaint, SUNY RF alleges that Inpria was acquired in September 2021. (*See, e.g.*, Dkt. No. 86, at 18, 233, 408). The distinction is immaterial to the instant motion.

emphasis on applications for [EUV] semiconductor processing[.]'" (*See* Dkt. No. 86, at 12).

Inpria also "admit[ed]" that it "practices its patented EUV semiconductor processing

technology," including the technology claimed in several of the U.S. Patents SUNY RF now

contests. (*See id.*) According to SUNY RF, "the MORE technology that Inpria now admits to

practicing and otherwise commercializing is a carbon copy of SUNY RF's Prior Project IP,"

which Inpria agreed not to use for any purpose other than the 2015 and 2017 RAs. (*Id.* at 13).

On July 31, 2023, Inpria assigned all rights to four of the currently contested patents

(U.S. Patent Nos. 11,740,559, 11,187,986, 10,627,719, 11,480,874), as well as the pending '244

and '437 Applications, to Tokyo Electron Limited ("Tokyo Electron"). (*Id.* at 100, 114, 249).

Inpria did not receive SUNY RF's consent or share proceeds from the assignment. (*See id.*).

"Inpria and JSR now manufacture, sell, export, import, license, and/or otherwise

commercialize a suite of EUV metal oxide photoresists and methods of developing the same, as

well as developers and other ancillary materials to enable and improve EUV lithography." (*Id.* at

229). "According to its 2023 Annual Report, JSR's EUV metal oxide photoresist products are

based on and/or incorporate Inpria technology." (*Id.*). "On information and belief, Inpria's and

JSR's customers include semiconductor equipment and materials companies, such as Tokyo

Electron and others, as well as semiconductor manufacturers, such as TSMC, SK hynix, []

Samsung, and others. Inpria's and JSR's list of customers, licenses, and commercial partners is

not publicly available." (*Id.* at 230).

In April 2024, Japan Investment Corp (JIC) acquired JSR and Inpria "for a reported $6.4

billion." (*Id.* at 233). The purchase "was made in reliance on JSR's misrepresentation that JSR

and Inpria were the sole owners of the rights to the then-existing Challenged Patents and the then

existing foreign counterparts to those Challenged Patents." (*Id.*). "JSR claimed exclusive rights to the technology at issue and JIC relied on that claim." (*Id.*).

SUNY RF alleges that Defendants Inpria and JSR have breached the 2015 and 2017 RAs by "failing to name Dr. Brainard and his co-inventors as inventors or co-inventors of [ ] patents and patent applications that Inpria has claimed as its own but which are plainly Prior Project IP or Foundation Inventions," "by failing to assign those patent and patent applications to SUNY RF, and by failing to acquire a license to use or otherwise commercially exploit such Prior Project IP or Foundation Inventions." (*Id.* at 14). According to SUNY RF, "[e]vidence uncovered to date without the benefit of discovery has revealed that [Defendants'] breaches and omissions extend to at least" U.S. Patent Nos. 9,310,684 (Dkt. No. 86-8); 10,025,179 (Dkt. No. 86-9); 10,416,554 (Dkt. No. 86-10); 10,732,505 (Dkt. No. 86-11); 11,754,924 (Dkt. No. 86-12); 10,775,696 (Dkt. No. 86-13); 11,537,048 (Dkt. No. 86-14); 11,809,081 (Dkt. No. 86-15); 10,228,618 (Dkt. No. 86-16); 11,740,559 (Dkt. No. 86-17); 11,187,986 (Dkt. No. 86-18); 10,627,719 (Dkt. No. 86-19); 11,480,874 (Dkt. No. 86-20); 9,823,564 (Dkt. No. 86-21); 11,693,312 (Dkt. No. 86-22); 10,642,153 (Dkt. No. 86-23); 11,392,029 (Dkt. No. 86-24); 11,500,284 (Dkt. No. 86-25); 11,673,903 (Dkt. No. 86-26); 10,787,466 (Dkt. No. 86-27); 10,975,109 Dkt. No. 86-28); 11,098,070 (Dkt. No. 86-29); 11,392,028 (Dkt. No. 86-30); 11,300,876 (Dkt. No. 86-31); 11,868,046 (Dkt. No. 86-32); 11,966,159 (Dkt. No. 86-33). (Dkt. No. 86, at 18). Defendants' breaches also extend to "the children and foreign counterparts of these patents, whether granted and issued, pending, or yet-to-be-filed children and foreign counterparts of these patents[.]" Collectively, these twenty-six patents and their children and foreign counterparts are referred to as the "Challenged Patents." (*Id.* (citing Dkt. No. 86-1)).

SUNY RF alleges a total of 318 claims for relief, (*see* Dkt. No. 86, at 234-456), including two claims for declaratory judgment, (*id.* at 234-36), twelve claims for breach of contract (including two claims for unjust enrichment "[i]n the alternative, in the event an enforceable contract is determined not to exist between SUNY RF and JSR as the successor, assign, and/or heir of Inpria), (*id.* at 236-59), 270 claims for correction of inventorship, (*id.* at 260-407), three claims for unjust enrichment, (*id.* at 407-14), one claim for breach of fiduciary duty, (*id.* at 414-417), twenty-six claims for conversion, (*id.* at 417-50), one claim for successor liability (*id.* at 450-51), one claim for alter ego liability, (*id.* at 451-54), and two claims for indemnification of attorneys' fees, costs, and expenses, (*id.* at 454-456).

## III.    DISCUSSION

### A.    Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, any party may request judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lively v. WAFRA Inv. Adv. Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)). Thus, "[t]o survive a Rule 12(c) motion, [the plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief ... calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Id.* (alteration in original) (quoting *Lynch*, 952 F.3d at 75). "In making this assessment, [the Court] 'draw[s] all reasonable inferences in [the plaintiff's]

favor.'" *Id.* (third alteration in original) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir.

2009)). "[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved

would defeat recovery, even if the trial court is convinced that the party opposing the motion is

unlikely to prevail at trial." *Id.* (quoting *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial

*Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 761 (D.C. Cir. 2019).

### B.    Analysis

Defendants' Motion for Partial Judgment on the Pleadings seeks dismissal of (1) the

breach of contract claims (with respect to eighteen of the twenty-six contested patents), (2) the

breach of fiduciary duty claim, (3) the conversion claims, (4) the unjust enrichment claims, and

(5) the declaratory judgment claims. (Dkt. No. 96, at 1-2). Defendants also seek JSR's dismissal

from the case. (*Id.* at 2). SUNY RF opposes dismissal. (Dkt. No. 101). The Court addresses each

argument in turn.

Both the 2015 and the 2017 RA contain a governing law provision, which requires their

agreements to be construed "in accordance with the laws of the State of New York, not including

its conflicts of laws principles." (Dkt. Nos. 86-2, at 7; 86-6, at 7). However, questions of patent

law are resolved according to federal law. *See Univ. of W. Virginia Bd. of Trustees v.*

*VanVoorhies*, 278 F.3d 1288, 1296 (Fed. Cir. 2002).

### 1.    Breach of Contract

SUNY RF alleges that Inpria and JSR breached several separate provisions in the 2015

and 2017 RAs. (*See* Dkt. No. 86, at 236-59 (alleging Claims 3, 5, 7, 10, 11, and 12 against Inpria

and JSR and Claims 8, 9, 13, and 14 against Inpria)). Claims 3 and 10 relate to Section 9(h) of

both the 2015 and 2017 RAs, and allege that both Defendants "breached, and continue to breach,

the license Inpria received in Section 9(h) . . . by using and continuing to use SUNY RF'S Prior

14

Project IP beyond the scope of the license," which was limited to carrying out the parties' research project. (Dkt. No. 86, at 236-37, 249-50). Specifically, Plaintiff alleges that Defendants "have used and continue to use SUNY RF's Prior Project IP for commercial purposes, including but not limited to each instance of using, manufacturing, offering for sale, selling, exporting, importing, and licensing of EUV metal oxide photoresists and related materials that incorporate and infringe SUNY RF'S Prior Project IP." (*Id.* at 237, 250). Plaintiff provides a list of "non-limiting examples" which include Defendants' manufacture of metal-oxide photoresists, sale of products and methods that "embody and infringe" the Prior Project IP, export of those products and methods around the world, and sublicensing of the Prior Project IP to third parties. (*Id.* at 237, 250-51). Plaintiff also alleges that Defendants breached and continue to breach the RAs by "using SUNY RF's Prior Project IP in the provisional patent applications and patent applications that matured or will mature into the Challenged Patents and the foreign counterparts to the Challenged Patents[.]" (*Id.* at 238, 251-52).

Claims 5 and 11 relate to Sections 9(a)-(d) of the 2015 and 2017 RAs, respectively, and assert that both Defendants breached the RAs when they used and continue to use Foundation Inventions without a license. (*Id.* at 240-41, 252-53). Plaintiff again alleges Defendants breached the RAs through their use, manufacture, sale, export, and licensing of EUV metal oxide photoresists and related materials, as well as in patent applications that matured or will mature into the Challenged Patents and their foreign counterparts. (*Id.* at 241-42, 253-54). Plaintiff alleges infringement activity similar to the activity alleged in Claims 3 and 10. (*See id.*).

Claims 7 and 12 relate to Section 9(e) of the 2015 and 2017 RAs, respectively, and refer to the parties' Joint IP. (*Id.* at 244, 254-55). Plaintiff claims that, "[t]o the extent Defendants argue the Foundation Inventions are Joint IP, in the alternative," both Defendants nevertheless

breached the RAs when they "exclusively used and continue to exclusively use SUNY RF's interest in the Joint IP . . . without exercising their option to obtain an exclusive license to such Joint IP." (*Id.* at 245, 255). Plaintiff says the RAs constitute an "agreement to the contrary" under 35 U.S.C. § 262[6] that precluded Defendants "from making, using, offering to sell, sell, or import the patented invention within the United States without the consent of SUNY RF and without accounting to SUNY RF." (*Id.*).[7]

Claims 8 and 13 relate to Section 9(j) of the RAs and allege that Inpria failed to assist Plaintiff or respond to Plaintiff's requests to "apply for, register, perfect, confirm, and protect [its] ownership rights[.]" (*Id.* at 247-48, 257-58). Finally, Claims 9 and 14 relate to Section 10 of the RAs, and allege, "[t]o the extent the '986 Patent, the '719 Patent, the '874 Patent, the '437 Application and the '244 Application are found to be Joint IP" as opposed to Prior Project IP or Foundation Inventions, "Inpria breached this Section 10 on March 1, 2023 when it, secretly and without the written consent of SUNY RF, assigned at least the '986 Patent, the '719 Patent, the '874 Patent, the '437 Application, and the '244 Application, to Tokyo Electron Limited[.]" (*Id.* at 249, 259).

### a.    Claims Against JSR

Defendants seek dismissal of all breach of contract claims alleged against JSR (Claims 3, 5, 7, 10, 11, and 12) on the ground that "JSR is neither a party to the Research Agreements nor the owner or assignee of any of the challenged patents." (Dkt. No. 96-16, at 34). SUNY RF opposes dismissal, arguing that it has alleged JSR's direct liability as Inpria's assignee or

---

[6] "In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." 35 U.S.C. § 262.

[7] SUNY RF also notes that the RAs are "territorially boarder [sic] than 35 U.S.C. § 262," because they define and govern IP rights "in any part of the world." (Dkt. No. 86, at 245, 255).

transferee under Sections 10 and 12 of the 2015 and 2017 RAs, which govern "Assignment" and "Binding Effect" of the Agreements. (*See* Dkt. Nos. 101, at 34; 86, at 236). Section 10 of the 2015 and 2017 RAs reads, in pertinent part, as follows:

> (a) Neither Party may assign or otherwise transfer this Agreement and the rights acquired hereunder without the written consent of the other Party; this consent shall not be unreasonably withheld. However, [Inpria] may assign or transfer its interest in this Agreement as long as such assignment or transfer is accompanied by merger, sale, or other transfer of all or substantially all of [Inpria]'s entire business or other business reasonably able to perform this Agreement. A Party desiring to assign or transfer this Agreement in a manner that requires consent shall give the other Party thirty (30) days prior notice of such assignment or transfer. If no reasonable objections are raised, then the assignment or transfer shall be deemed to have been approved. However, an assignment or transfer shall not be deemed to be approved unless the Party to which this Agreement is assigned agrees in writing to be bound by the terms and conditions of this Agreement.
> (b) This Agreement shall accrue to the benefit of and be binding upon the successors, assigns, heirs, and personal representatives of the Parties hereto.

(Dkt. Nos. 86-2, at 6; 86-6, at 6). Section 12 of the Agreements, "Binding Effect," says that "This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors or assigns." (*Id.* at 7).

Under New York law, "[a] contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 135-36 (S.D.N.Y. 2013) (quoting *Wolfson v. Conolog Corp.*, No. 08-cv-3790, 2009 WL 465621, at *3, 2009 U.S. Dist. LEXIS 14822 *6 (S.D.N.Y. Feb. 25, 2009)). "[C]ontracts are freely assignable absent language which expressly prohibits assignment." *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 494 (S.D.N.Y. 2011) (quoting *Corbett v. Firstline Security, Inc.*, 687 F. Supp. 2d 124, 129 (E.D.N.Y. 2009)). However, "[e]ven where an 'agreement purport[s] to bind successors and assigns of the parties to the agreement, an assignee or successor will not be bound to the terms of

a contract absent an affirmative assumption of the duties under the contract.'" *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390 (S.D.N.Y. 2019). Moreover, "absent an agreement to the contrary, 'the mere assignment of a contract is an assignment of the rights in the contract and not of the assignor's duties and liabilities incurred prior to the assignment.'" *In re Refco*, 826 F. Supp. 2d at 494 (quoting *A.C. Assocs. v. Am. Bridge Div. of U.S. Steel Corp.*, No. 88-cv-8861, 1989 WL 1111034, at *1, 1989 U.S. Dist. LEXIS 15053, at *3 (S.D.N.Y. Dec. 18, 1989)). "[M]ere participation or support in the performance of a contract does not constitute assumption" of the duties or liabilities under a contract. *Id.* at 495.

SUNY RF says that it has plausibly alleged direct claims against JSR for breach of contract because, "[a]ccording to Sections 10 and 12," the 2015 and 2017 RAs are "binding upon the successors, assigns, heirs, and personal representatives of Inpria, including JSR." (*See, e.g.*, Dkt. No. 86, at 236). While the RAs state that no "assignment or transfer" shall be "deemed to be approved unless the Party to which this Agreement is assigned agrees in writing to be bound by the terms and conditions" of the parties' agreement, (*See, e.g.*, Dkt. No. 86-2, at 6), SUNY RF alleges that JSR has "expressly and/or impliedly assumed, consented to, assented to be bound by the terms and conditions" of the 2015 and 2017 Research Agreements "in the agreements governing the Inpria-JSR acquisition and separate indemnification agreement(s)." (*See, e.g.*, Dkt. No. 86, at 236). SUNY RF alleges this on information and belief. Specifically, it alleges that "JSR acquired all or substantially all of Inpria's business when it acquired Inpria for $514 million. At the time of the acquisition and thereafter, JSR has expressly and/or impliedly assumed, consented to, assented to be bound by the terms and conditions" of the 2015 and 2017 RAs, "including as one would expect, and therefore on information and belief SUNY RF alleges, in the agreements governing the Inpria-JSR acquisition and separate indemnification

agreement(s). (*Id.*). SUNY RF also alleges that these "agreements and negotiations are non-public and thus must be obtained through discovery." (*Id.* at 451).

While SUNY RF's factual allegations are made only on "information and belief," SUNY RF is correct that the *Twombly* plausibility standard does not prevent plaintiffs from "pleading facts alleged upon information and belief" where those facts "are peculiarly within the possession and control of the defendant." *See Arista Records, LLC. V. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). SUNY RF has alleged that these agreements are non-public, and thus arguably within the peculiar possession and control of the Defendants. At this early stage in the litigation, the Court will not dismiss the breach of contract claims against JSR. *See Teixeria v. St. Jude Med. S.C., Inc.*, 193 F. Supp. 3d 218, 231 (W.D.N.Y. 2016) ("Where, as here, the [c]ourt is evaluating the sufficiency of "information and belief" allegations, its task is to determine whether—viewing all of the Amended Complaint's factual allegations in the light most favorable to Plaintiff—the pleadings made on 'information and belief' raise a reasonable expectation that discovery will reveal evidence proving Plaintiff's claim." (internal quotations and alterations omitted)). Accordingly, Defendants' motion for judgment on the pleadings dismissing the breach of contract claims as to JSR is denied.

### b.    Statute of Limitations

Defendants argue that the breach of contract claims are time-barred with respect to eighteen of the twenty-six patents. (Dkt. No. 96-16, at 16). Specifically, Defendants assert that the breach claims based on Patent Nos. '564, '312, '684, '179, '554, '159, '153, '029, '284, '505, '924, '696, '048, '081, '618, '559, '986, and '719 are untimely. (*Id.* at 18). According to Defendants, "all of [SUNY RF's] breach claims are premised on the underlying allegation that Inpria improperly obtained patent rights by using Plaintiff's alleged intellectual property in the patent applications." (*Id.* at 16). "There would be no patents to assign, no patent ownership rights

to protect, and no patents to commercially exploit, had Inpria not filed these patent applications in the first place." (Dkt. No. 104, at 5). Defendants note that New York has a six-year statute of limitations for breach-of-contract claims, and that the limitations period begins to run when the cause of action accrues. (Dkt. No. 96-16, at 17); *see Marvel Worldwide, Inc. v. Kirby*, 756 F. Supp. 2d 461, 470 (S.D.N.Y. 2010).

Defendants argue that "when an alleged breach concerns misuse of information to obtain patent rights," a breach of contract claim "accrues upon the filing of the first patent associated with the patent in dispute." (Dkt. No. 96-16, at 17 (citing *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 505 (S.D.N.Y. 2013); *Arcadia Biosciences, Inc.*, 356 F. Supp. 3d at 399). Defendants assert that the twenty-six challenged patents "comprise 11 patent families," and ask the Court to consider the "earliest priority date"[8] for each of these families as the date of accrual for statute of limitations purposes. (*Id.* at 13-14). Defendants conclude that Plaintiff's breach of contract claims are time-barred with respect to eighteen of the twenty-six challenged patents because "Inpria filed the first patent application with respect to" those eighteen patents between 2010 and 2016—"more than six years before the November 7, 2023 effective date" under the parties' tolling agreement. (Dkt. No. 96-16, at 17-18).[9] Defendants acknowledge that the Amended Complaint alleges "*more recent* breaches . . . based on Inpria's alleged patent 'assignments,' failure to 'protect' Plaintiff's 'ownership rights' . . . and 'commercial

---

[8] Defendants define a patent's "earliest priority date" as "the date on which the patent application was filed with the United States Patent and Trademark Office ('PTO'), unless the patentee claims the benefit of an earlier-filed application pursuant to 35 U.S.C. § 120." (Dkt. No. 96-16, at 13 n.4 (quoting *Midwest Energy Emissions Corp. and Mes Inc. v. Arthur J. Gallagher & Co.*, No. 19-1334-CJB, 2023 WL 7411160, at *2, 2023 U.S. Dist. LEXIS 202116, at *6 (D. Del. Nov. 3, 2023)).

[9] The Court notes that the parties entered into a "Tolling Agreement" on November 14, 2023, agreeing that all statutes of limitations or equitable doctrines such as laches applicable to their claims against each other would be tolled. (Dkt. No. 96-16, at 15). The termination date for this agreement was ultimately extended to January 22, 2024. (*Id.*).

exploitation' of these patents," but argue that such "allegations do not restart the clock." (Dkt. No. 104, at 5).

SUNY RF asserts that Defendants (1) "improperly group" all of SUNY RF's breach claims together in spite of SUNY RF's separate claims, (2) mischaracterize the breach claims by asserting they are 'premised on the underlying allegation that Inpria improperly obtained patent rights[,]'" and (3) fail to address accrual dates in the context of SUNY RF's ownership rights, which "exist independent of any actions Inpria took, whether as to certain patent applications, (mis)use of information, or otherwise." (Dkt. No. 101, at 15 (quoting Dkt. No. 96-16, at 16)).

"[T]he expiration of the statute of limitations is an affirmative defense under which the defendant bears the burden of proof." *Ferring B.V.*, 932 F. Supp. 2d at 501 (citing Fed. R. Civ. P. 8(c)). But "courts may nonetheless dismiss a case on statute of limitations grounds if a complaint, on its face, 'clearly shows the claim is out of time.'" *Boles v. Eastman Kodak Co.*, No. 14-cv-6243, 2015 WL 213248, at *1, 2015 U.S. Dist. LEXIS 4388, at *2 (W.D.N.Y. Jan. 14, 2015) (quoting *Harris v. N.Y.C.*, 186 F.3d 243, 250 (2d Cir. 1999)). A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). However, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). "To establish that the statute of limitations bars Plaintiff's claims on a motion to dismiss, Defendants must establish that Plaintiff's own allegations of fact clearly establish that its claims are untimely." *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 156-157, 163 (E.D.N.Y. 2010). ("For a defendant's statute of

limitations arguments to succeed, the plaintiff must 'plead[ ] itself out of court.'"(quoting *In re marchFIRST Inc.*, 589 F.3d 901, 904-05 (7th Cir. 2009) (alteration in original)).

With respect to the breach of contract claims, "New York's statute of limitations for breach of an express or implied contract is six years." *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 260 (S.D.N.Y. 2008). "A cause of action for breach of contract usually accrues, and the limitations period begins to run, upon breach." *Id.* Under New York law, it is also "well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered." *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997).[10] Thus, on a motion to dismiss, "[a] court looks to the latest accrual dates of the breach of contract claims reasonably suggested by the facts alleged in the Complaint." *St. John's*, 757 F. Supp. 2d at 163.

Where a contract contemplates "research over an extended period of time," with various potential patentable inventions, "[t]he determination how to define a particular invention, and whether it was a 'patentable invention' subject to [the parties' agreement requiring the assignment of patents], would not necessarily become clear until the parties decided to seek patent protection for it." *Id.* at 164. Further, "the precise nature of the 'patentable' inventions to

---

[10] However, if "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." *Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007) ("Because Defendants' obligation to contribute $10,000 per year to Plaintiff's pension fund was a continuing one, Plaintiff's claim that Defendants breached that obligation within six years of the commencement of this action is timely."). Defendants only briefly address and dismiss the possibility that their alleged breaches are ongoing, (*see* Dkt. No. 96-16, at 18-19), without examining the significant differences between the contracts at issue here (two extensive research agreements) and the contracts at issue in their cited cases, *see Arcadia Biosciences*, 356 F. Supp. 3d at 398 (continuing wrong doctrine did not apply to breach of a non-disclosure agreement where there was no dispute that confidential information was disclosed outside the statute of limitations, and plaintiff did not allege any facts to support its allegation that defendants were "misusing and misappropriating" their confidential information for business activities); *Fioranelli v. CBS Broadcasting Inc.*, 551 F. Supp. 3d 199, 256 (holding, on summary judgment, that statute of limitations barred the plaintiff's breach of contract claims, because continuing wrong doctrine did not apply to subsequent alleged successive breaches of agreement not to license footage to a third party). Because the Court rejects Defendants' argument on other, more preliminary grounds, the Court need not reach this issue.

which [a party] was entitled would not necessarily become clear until the PTO issued a patent,

which defines the invention by its claims." *Id.* at 165. ("Under the circumstances, the latest event

triggering [defendants'] duties of performance that can reasonably be inferred from the

Complaint was the issuance of a patent by the PTO that disclosed an invention subject to the

Agreements. Therefore, [defendants] were obligated to perform their assignment duties within a

reasonable time following the issuance of each of the [contested] Patents, and they breached the

Agreements when they failed to do so.").

### i.    Earliest Priority Dates

Defendants do not meaningfully engage with the contents or provisions of the 2015 and

2017 RAs themselves. Instead, Defendants (without citing any specific provision of either

agreement) direct the Court's attention to certain application dates on each of the patents at issue,

arguing that the earliest priority dates are the dates of accrual for statute of limitations

purposes.[11] (Dkt. No. 96-16, at 13, 17-18). Defendants ask the Court to assume, from the dates

indicated on eighteen of the twenty-six patents—some of which are continuation patents or non-

provisional patents that claim priority to these earlier filing dates, but were actually filed as

recently as 2022—in order to dismiss all contract claims involving those eighteen patents. This

argument is without merit.

---

[11] Defendants rely on the benefit of earlier-filed patent applications to determine what Defendants call the patents' "earliest priority date[s]." (See Dkt. No. 96-16, at 13-14). For example, the '179 patent indicates that it was filed on Dec. 29, 2015, and that it is a "continuation" of application No. 12/973,098, filed on Aug 22, 2013. (Dkt. No. 86-9, at 2). In their brief, Defendants list Aug. 22, 2013 as '179's earliest priority date, not Dec. 29, 2015. (See Dkt. No. 96-16, at 13). The '505 patent indicates that it was filed on Apr. 29, 2020 and that it is related to two "provisional" applications, the earliest of which was filed on Oct. 13, 2015. (Dkt. No. 86-11). Defendants list Oct. 13, 2015 as the ''505 patent's earliest priority date. (Dkt. No. 96-16, at 13).

"Patent priority establishes who is entitled to a patent on a particular invention claimed by different parties." *SNIPR Techs. Ltd. v. Rockefeller Univ.*, 72 F.4th 1372, 1374 (Fed. Cir. 2023).

> "Passed in 2011, the [America Invents Act ("AIA")] changed how priority is determined, by converting the U.S. patent system from a first-to-invent to a first-inventor-to-file system. Under the first-to-invent system, the first person to invent a claimed invention had priority and was entitled to a patent. This is true even when a later inventor beats the first inventor to filing a patent application. When two different inventive entities claimed the same subject matter in a patent or patent application, the Patent Office would conduct an often arduous administrative proceeding—an interference proceeding—to determine the right of priority, i.e., who was the first inventor. Under the AIA, however, interferences to determine which inventor had the earliest invention date are no longer necessary because it is now the first filer—not the first inventor—who has priority and is entitled to a patent.

*Id.* (internal citations omitted).

The earliest priority dates relied upon by Defendants include provisional application filing dates. (*See, e.g.*, Dkt. No. 86-11). Under 25 U.S.C. § 119(e)(1), there are four requirements "that must be met for a non-provisional patent application to claim priority to a provisional application filing date, and therefore, gain the benefit of that earlier date." *Speedfit LLC v. Woodway USA, Inc.*, 432 F. Supp. 3d 183, 203 (E.D.N.Y. 2020). "A non-provisional patent application can claim priority to a provisional application filing date, if 'the specification of the *provisional* contain[s] a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' to enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-provisional* application." *Speedfit LLC v. Chapco Inc.*, 490 F. Supp. 3d 575, 591 (E.D.N.Y. 2020) (cleaned up) (quoting *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015)).

The earliest priority dates relied upon by Defendants also include the dates of continuing patent applications.[12] (*See, e.g.*, Dkt. No. 86-9). As with provisional applications, continuing patent applications must meet certain statutory requirements to be entitled to an earlier priority date. *See Nat. Alternatives Int'l, Inc. v. Iancu*, 904 F.3d 1375, 1380 (Fed. Cir. 2018) (quoting *In re NTP, Inc.*, 654 F.3d 1268, 1276 (Fed. Cir. 2011) ("[F]or a patent's claims to be entitled to an earlier priority date, the patentee must *demonstrate* that the claims meet the requirements of 35 U.S.C. § 120."). Relevant here, the PTO has noted that the terms "continuation" and "continuation-in-part" are "merely terms used for administrative convenience." *Transco Prods. Inc.*, 38 F.3d at 556. "[T]he bottom line is that, no matter what term is used to describe a continuing application, that application is entitled to the benefit of the filing date of an earlier application only as to common subject matter." *Id.* "[T]he designation given to a derivative application does not determine its legal status. *Anascape, Ltd. v. Nintendo of Am. Inc.*, 601 F.3d 1333, 1338 n.2 (Fed. Cir. 2010).

For a continuation patent to "properly claim priority to a patent earlier in the priority chain," Federal Circuit case law "emphasizes that there must be a continuity of disclosure." *Akeva L.L.C. v. Nike, Inc.*, 817 F. App'x 1005, 1012 (Fed. Cir. 2020). For a patent to claim priority to a patent earlier in the priority chain, therefore, "there must be adequate written

---

[12] There are "various types of 'continuing' applications that one may file at the PTO." *Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994). Specifically:

An applicant may file a continuation, divisional, or continuation-in-part (CIP) application of a prior application, all of which the PTO characterizes as "continuing" applications. In general, a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application . . . A 'CIP' application is a continuing application containing a portion or all of the disclosure of an earlier application together with added matter not present in that earlier application. The term "parent" is often used to refer to the immediately preceding application upon which a continuing application claims priority; the term "original" is used to refer to the first application in a chain of continuing applications.

*Id.* at 555-56 (citations omitted).

description support for the Continuation Patent claims through the chain of applications back to that earlier patent." *Id.* If there is a "break" in the priority chain, then the continuation patent cannot claim priority to the earlier date. *Id.* "Thus, a patent application will receive the benefit of a parent application's earlier filing date if: (1) the applications are submitted by the same inventor or inventors; (2) the applications were co-pending, meaning that the second application was filed while the first application was still pending; (3) the later application contains a specific reference to the prior application; and (4) the prior application disclosed the invention in the manner required by 35 U.S.C. § 112." *Pfizer Inc. v. Perrigo Co.*, 933 F. Supp. 377, 380 (S.D.N.Y. 1996).

   "A prior application's written description is sufficient if that description 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'" *Greenfield v. Mold-Rite Plastics, LLC*, No. 20-cv-639, 2020 WL 14024164, at *9, 2020 U.S. Dist. LEXIS 274155, at *25 (N.D.N.Y. Dec. 16, 2020) (quoting *In re Daniels*, 144 F.3d 1452, 1456 (Fed. Cir. 1998)). "In other words, the applicant 'does not have to describe exactly the subject matter claimed,' but still 'the description must clearly allow persons of ordinary skill in the art to recognize that the applicant invented what is claimed.'" *Id.* "If that inquiry seems too fact-intensive to be resolved on a Rule 12(b)(6) motion, that is because it is." *Id.*, 2020 WL 14024164, at *10, 2020 U.S. Dist. LEXIS 274155, at *28 ("As Greenfield correctly notes, Mold-Rite has not cited a single case disposing of the priority question at the motion to dismiss stage, and the Court is aware of none. Accordingly, the Court cannot consider the question of plaintiff's patent's priority at present[.]"). It is one thing for the Court to consider the *fact* of the provisional application dates and the continuation application dates of the patents attached to the Complaint

on a motion for judgment on the pleadings; it is quite another for the Court to accept those dates as a final resolution of patent priority.

Further, Defendants do not endeavor to explain how, even assuming an alleged breach of contract accrued on a given patent priority date, their accrual theory applies to the nine patents with priority dates *predating* the RAs. (Dkt. No. 96-16, at 13). SUNY RF's hypothetical example is helpful: Defendants argue SUNY RF's claim "concerning the application giving rise to the '312 Patent is time-barred due to an alleged 'priority' application dating to 'June 1, 2010'— which would mean this claim was barred 4.5 years before the first Research agreement was executed, which makes no sense." (Dkt. No. 101, at 20 (citing Dkt. No. 96-16, at 18)). Indeed, the face of the '312 patent itself indicates that the application for the '312 patent was filed on August 25, 2022, and did not issue until July 4, 2023, well within the six-year statute of limitations. (Dkt. No. 86-22, at 2). Even assuming SUNY RF's breach of contract claims with respect to the '312 patent could accrue as of the date of issuance, when "the precise nature of the 'patentable' inventions" might become clear, *see St. John's* at 165, that claim may be timely. According to SUNY RF, of the twenty-six Challenged Patents, only six were filed—and only *one* was issued—more than six years before the effective date of the parties' tolling agreement. (*See* Dkt. No. 86-1).[13]

Defendants point to two cases in which a court found a breach of contract claim barred by the statute of limitations on the basis that the claims related to a patent that was filed outside the six-year limitations period, but those cases are factually distinct from the case at hand. (*See* Dkt. No. 96-16, at 17-19). In *Arcadia Biosciences* the plaintiff alleged that the defendants breached a

---

[13] It is conceivable that a claim for breach of contract might fail with respect to a patent issued—or perhaps even *filed*—outside the statute of limitations, but Defendants have not briefed the Court in any meaningful way on their interpretation of the content of either research agreement.

non-disclosure agreement by "misusing and disclosing" the plaintiff's "confidential information" through one of the defendant's patents. 356 F. Supp. 3d at 398. The court found the breach of contract claims time barred because the plaintiff alleged that the confidential information was disclosed when the defendants first pursued the patent information in applications filed outside the six-year limitations period, and there was no allegation that any additional confidential information was disclosed in later applications filed during the six-year limitations period. *Id.* at 398-99. Unlike the case at bar, there was no dispute as to *whether* those applications disclosed the plaintiff's confidential information, nor any factual allegations as to how the defendant might have breached the NDA other than by disclosing confidential information. *Id.* And in *Ferring B.V.*, the court held that an employee breached an agreement with his employer which required him to "assign his ownership rights to any invention (or any improvement upon or addition to an invention) applicable to the business then being carried on" by his employer that the employee "made, discovered, or participated in the discovery of" during his employment. 932 F. Supp. 2d 493, 498-99. The court found that the employee breached his employment agreement when he "first pursued his patent applications independently[.]" 932 F. Supp. 2d at 508. Moreover, in *Ferring B.V.* there was apparently no dispute as to when the employee's obligation to assign his rights to his employer arose, nor whether those patent applications contained intellectual property that should have been assigned to his employer. *Compare id. with St. John's*, 757 F. Supp. 2d 144 at 164-65 (noting that employees' duty to assign patents to employer would not have become clear until the PTO issued a patent).

### ii.    Application to the Claims at Issue

Here, SUNY RF's allegations are based on several different provisions of the RAs, none of which are confronted directly by Defendants in their statute of limitations argument. Claims 3,

5, 7 and 10 through 12 all include allegations that Defendants breached the RAs through their improper commercial use of Prior Project IP, Foundation IP, and Joint IP. (Dkt. No. 86, at 236-47, 250-57). Claims 3 and 10 allege that both Defendants breached Section 9(h) of the RAs, which granted Inpria a license to use SUNY RF's Prior Project IP to carry out the project, (*see* Dkt. No. 86-2 at 5), when Defendants used SUNY RF's Prior Project IP for commercial purposes, (*see* Dkt. No. 86, at 236-38, 249-52). SUNY RF specifically alleges that Defendants improperly used SUNY RF's IP for commercial purposes within the six-year statute of limitations. (*See id.* at 18-20). But Defendants cite no case law and provide no analysis supporting dismissal for a breach of contract claim alleging that a party improperly used certain IP for commercial purposes.

Claims 5 and 11 allege that both Defendants breached sections 9(a)-(d) of the RAs, which required that SUNY RF would "hold title to" all intellectual property rights "generated, conceived, or reduced to practice during the conduct of work under [the RAs] utilizing facilities or personnel" of SUNY RF. (*See* Dkt. No. 86-2, at 4). SUNY RF alleges that Defendants breached these provisions when they used Foundation inventions for commercial activity without a license, and when they used Foundation inventions "in the provisional patent applications and patent applications that matured or will mature into the Challenged Patents and the foreign counterparts to the Challenged Patents." (*See* Dkt. No. 86, at 241-42, 253-54). Defendants do not consider when SUNY RF's rights to hold title to intellectual property would have been clearly established, nor *when* or *where* the intellectual property was "generated, conceived, or reduced to practice." Further, whether the patents that are subject to these claims *are* Foundation IP would "not necessarily become clear" until the patents were issued—when "the precise nature of the 'patentable' inventions" to which the parties were entitled would "become clear[.]" *See St.*

*John's*, 757 F. Supp. 2d at 164-65. Instead, Defendants lump all of the contested patents together, sort them by a date of administrative convenience, and assume—without explaining— that SUNY RF's rights to "hold title" accrued upon the earliest priority date for each of the contested patents. (*See* Dkt. No. 96-16, at 13-19). Even *Ferring B.V.* does not go so far; in that case, the court determined that the plaintiff's claims accrued when the defendant "first pursued his patent applications independently"—*not* on the date to which those patent applications claimed priority. *See* 932 F. Supp. 2d at 508.[14]

Claims 7 and 12 allege that the Defendants breached Section 9(e) of the RAs, which requires that SUNY RF and Inpria would "hold joint title" to intellectual property that was not generated utilizing either SUNY RF or Inpria facilities and personnel exclusively. (Dkt. No. 86-2, at 5). But as above, Defendants do not discuss when those rights might have accrued—nor, as with the Foundation inventions, would it have become clear whether the patents relevant to these claims *were* Joint IP until they were issued. *See St. John's*, 757 F. Supp. 2d at 164-65.

Claims 8 and 13 allege Inpria breached Section 9(j) of the RAs, which required the parties to "cooperate" and "take such other action as the other Party may reasonably request to apply for, register, perfect, confirm, and protect ownership rights set forth" in Section 9 of the RAs. (Dkt. No. 86-2, at 6). But Section 9(j) "does not concern use or misuse of information at all[,] [n]or do the factual allegations for Claims 8 and 13 mention use or misuse of information."

---

[14] It is conceivable that, under *Ferring B.V.* and *Allergan*, SUNY RF's claims for breach of contract based on use of SUNY RF's Prior Project IP, Foundation IP, or Joint IP in Defendants' patent *applications* might be time-barred with respect to the applications *actually filed* more than six years prior to the effective date of the parties' tolling agreement. *See Arcadia*, 356 F. Supp. 3d at 398-99; *Ferring B.V.*, 932 F. Supp. 2d at 508. But because these claims are only part of SUNY RF's larger Claims 3, 5, 7 and 10-12, (*see* Dkt. No. 86, at 238, 242, 246, 251, 254, 256), and because the allegations in the Amended Complaint are not limited to specific provisional patent or continuation patent applications, but also include patent applications, it is not possible on this record to determine what IP was disclosed in which applications. Therefore, the Court will not dismiss the claims based on misuse of IP in patent applications.

(Dkt. No. 101, at 15). These claims relate to SUNY RF's ownership rights in certain intellectual property, not to inventorship or disclosure of confidential information.

Finally, Claims 9 and 14 allege Inpria breached Section 10 of the RAs, which prohibited either party from assigning or otherwise transferring the RAs and the rights acquired thereunder "without the written consent of the other Party." (Dkt. Nos. 86-2, at 6; 86-6, at 6). SUNY RF alleges that Inpria breached this provision on March 1, 2023, when it assigned three patents and two applications to Tokyo Electron, "secretly and without" SUNY RF's "written consent[.]" (Dkt. No. 86, at 249, 259). Defendants cite no case law and provide no analysis regarding when the statute of limitations accrues in the context of a breach of contract claim alleging that a party improperly assigned certain patents in violation of an agreement's assignment provisions. And as SUNY RF alleges the improper assignment occurred on March 1, 2023, well within the six-year limitations period. (*Id.*). And again, as above, the parties could not have determined whether the patents that are subject to Claims 9 and 14 are Joint IP within the meaning of the RAs until their respective patents were issued. *See St. John's*, 757 F. Supp. 2d at 164-65. The Court cannot say the statute of limitations defense is apparent on the face of the Amended Complaint.

At this stage, there are not enough facts on the face of the Amended Complaint to demonstrate that SUNY RF's contract claims related to the eighteen patents identified above, regarding Defendants' allegedly improper assignment of patents and patent applications, failure to protect SUNY RF's ownership rights, and improper commercial exploitation of SUNY RF's intellectual property, are time-barred. Therefore, Defendants' motion for judgment on the pleadings with respect to SUNY RF's breach of contract claims is denied.[15]

---

[15] Because the Court denies Defendant's motion on other grounds, the Court need not reach Plaintiff's tolling allegations.

2.    **Breach of Fiduciary Duty**

Defendants argue that SUNY RF's claim for breach of fiduciary duties against Inpria must fail, because Inpria was not SUNY RF's fiduciary—rather, Inpria was "merely in an arm's-length business relationship with [SUNY RF]." (Dkt. No. 96-16, at 21). Further, Defendants assert that this claim is time-barred and "improperly duplicative of [SUNY RF]'s breach of contract claims[.]" (*Id.*). SUNY RF disagrees, arguing that there is "sufficient factual content to satisfy the *Twombly-Iqbal* standard and plausibly allege Inpria owed fiduciary duties to SUNY RF." (Dkt. No. 101, at 22). SUNY RF argues that its claim is "timely as a matter of law," and that it appropriately pleads a legal duty apart from the contractual obligations between the parties such that their fiduciary duty claim is not duplicative. (*Id.* at 25-29).

"To state a claim for breach of fiduciary duty under New York law, a plaintiff must allege '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'" *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 206 (S.D.N.Y. 2014) (quoting *Varveris v. Zacharakos*, 973 N.Y.S.2d 774, 775 (N.Y. App. Div. 2013)). "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Roni LLC v. Arfa*, 963 N.E.2d 123, 124 (N.Y. 2011) (internal quotation marks omitted). "New York courts have noted the difficulty in establishing the existence of a fiduciary relationship between parties because of its amorphous nature . . . [but] generally describe it as a relationship 'founded upon trust or confidence reposed by one person in the integrity and fidelity of another . . . in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *Henneberry v. Sumitomo Corp. of*

*Am.*, 532 F. Supp. 2d 523, 550 (S.D.N.Y. 2007) (quoting *Penato v. George*, 383 N.Y.S.2d 900, 904 (N.Y. App. Div. 1976)).

"[D]etermining the existence of a fiduciary relationship requires a fact-specific inquiry implicating all the circumstances and conduct relevant to understanding the parties' relationship." *St. John's*, 757 F. Supp. 2d at 166. "This inquiry assesses whether the particular relationship has the '[f]our elements that are essential to the establishment of a fiduciary relationship: (1) the vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself.' *Id.* (quoting *Atlantis Info. Techn., GmbH v. CA, Inc.,* 485 F. Supp. 2d 224, 231-32 (E.D.N.Y. 2007)). Because ascertaining the existence of a fiduciary relationship requires a fact-specific inquiry, "a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Mosdos Chofetz Chaim*, 14 F. Supp. 3d at 208 (quoting *Abercrombie v. Andrew College,* 438 F.Supp.2d 243, 274 (S.D.N.Y.2006).

"In beginning this relationship-specific inquiry, New York courts look first to whether there is a contractual relationship between the parties." *St. John's*, 757 F. Supp. 2d at 166. While some courts have found that "a sufficiently comprehensive contract between the parties will defeat a finding that the parties were in a fiduciary relationship," the existence of a contract "defining the broad contours of their relationship does not preclude a finding of a fiduciary relationship." *Id.* "To the contrary, a contract may create a fiduciary relationship" "independent of the contractual obligation" if it "establishes a relationship of trust and confidence between the parties." *Id.* (quoting *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005).

"The terms of the parties' written Agreements, as alleged by Plaintiff, provide the court's starting point." *St. John's*, 757 F. Supp. 2d at 167. And in this case, the RAs state that SUNY RF and Inpria had "a mutual interest in promoting research and development activities related to organometallic photoresist materials[.]" (*See* Dkt. Nos. 86-2, at 2; 86-6, at 2). Inpria approved funding to "support a research and development project," but did not demand production of a specific product by a certain date. (*Id.*). Instead, the RAs required SUNY RF to "use its best efforts to conduct and carry out" their project, "and to do so in cooperation and coordination with" Inpria. (*Id.*). SUNY RF alleges that it was in a fiduciary relationship with Inpria "from no later than 2012 through at least August 31, 2019, including because the SEMATECH policies and practices, non-disclosure agreements, Research Agreements, and SUNY Patents and Inventions Policy entered into by or otherwise binding on the parties established a relationship of trust and confidence between the parties." (Dkt. No. 86, at 414). SUNY RF alleges that it was "vulnerable" to Inpria, because it was required to carry out the research and development and send reports across the country where it "could not monitor" how its information "was being used, [who] was given access to [it], or how" its information was "being tracked and maintained[.]" (*See* Dkt. No. 86, at 414-15). *See St. John's*, 757 F. Supp. 2d at 167 ("St. John's assent to [the defendants'] request for special permission [to conduct some of their research off-campus] clearly demonstrates that it trusted [defendants] to fulfill their responsibilities under the Agreements insofar as St. John's relinquished what little ability it already had to independently check on the progress of the research.").

SUNY RF also alleges that it "reposed trust, confidence, [and] empowerment in Inpria because as a member of a private industry it was in the best position to develop, license, and commercially exploit an inventions or patents[.]" (Dkt. No. 86, at 416). Finally, SUNY RF

alleges that Inpria's "empowerment" was "solicited or accepted by" Inpria, and prevented SUNY RF "from effectively protecting itself," because Inpria officers and employees "urged and assured Dr. Brainard, his research team, and SUNY RF to put their trust and confidence in Inpria, including by stating that the relationship would be 'based on mutual trust' and would be 'fair and equitable all around.'" (Dkt. No. 86, at 414-15). On these facts, at this stage, on an issue requiring a fact-specific inquiry, SUNY RF's allegations are sufficient to plead a fiduciary relationship. *See St. John's*, 757 F. Supp. 2d at 166-68.

Alternatively, Inpria claims that the fiduciary claim is time-barred. (Dkt. No. 96-16, at 23). Again, "the statute of limitations is an affirmative defense on which a defendant bears the burden of proof," although the Court may "nonetheless dismiss a case on statute of limitations grounds if a complaint, on its face, 'clearly shows the claim is out of time.'" *See Boles*, 2015 WL 213248, at *1, 2015 U.S. Dist. LEXIS 4388, at *2. "New York law does not provide a single statute of limitations for breach of fiduciary duty claims. Rather, the choice of the applicable limitations period depends on the substantive remedy that the plaintiff seeks[.]" *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). "Where the remedy sought is purely monetary in nature, courts construe the suit as alleging 'injury to property' within the meaning of CPLR 214(4), which has a three-year limitations period[.]" *Id.* "Where, however, the relief sought is equitable in nature, the six-year limitations period of CPLR 213(1) applies." *Id.* "Moreover, where an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213(8)[.]" *Id.* The limitations period applicable to a claim for breach of fiduciary duty, however, is tolled during the duration of the fiduciary relationship, and does not begin to run "until the fiduciary has openly repudiated his or

her obligation or the relationship has been otherwise terminated." *St. John's*, 757 F. Supp. 2d at 169-70 (quoting *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 518 (2d Cir.2001).

Inpria claims that the three-year statute of limitations must apply here because SUNY RF seeks solely money damages based on Inpria's alleged breaches of fiduciary duty. (Dkt. No. 96-16, at 24). This ignores, however, SUNY RF's numerous requests for declaratory and injunctive relief. (Dkt. No. 86, at 459-60). In any event, Inpria argues that all of SUNY RF's fiduciary claims are time-barred because all of the Challenged Patents "were filed more than three years before the November 7, 2023 effective date" under the parties' tolling agreement. (Dkt. No. 96-16, at 24-25).

Preliminary, the Court notes that (according to the appendix attached to the Amended Complaint) five of the Challenged Patents were filed as recently as 2022. (*See* Dkt. No. 86-1). If that is correct, not all of the Challenged Patents were filed more than three years before the parties' tolling agreement.[16] Further, SUNY RF alleges that the fiduciary relationship continued "through at least August 31, 2019," (Dkt. No. 86, at 414),  and "[t]he limitations period applicable to a claim for breach of fiduciary duty . . . is tolled during the duration of the fiduciary relationship[.]" *St. John's*, 757 F. Supp. 2d at 169. The limitations period on SUNY RF's breach of fiduciary duty claim would not begin to run until Inpria "openly repudiated [its] obligation or the relationship [was] otherwise terminated." *See id.* at 169-70. Defendants do not address SUNY RF's argument that the statute of limitations was tolled until the end of the parties' fiduciary relationship, which Plaintiff alleges was on August 31, 2019, at the earliest, or whether the six-year statute of limitations is applicable to SUNY RF's claims for declaratory and

---

[16] To the extent that Defendants rely on the patents' earliest priority dates to make this argument, (*see* Dkt. No. 96-16, at 13-14), rather than the patents' file date, the Court has already considered and rejected this argument, *see* discussion *supra* Sec. III.B.1.b.

injunctive relief (filed in 2024); Defendants only argue that any alleged claims accrued when the patent applications were filed, (Dkt. No. 96-16, at 24). Defendants continue to cite *Ferring B.V.*, which does not address a fiduciary duty claim in any depth and is factually distinct for the reasons noted above. *See* discussion *supra* Section III.B.1.b. Again, at this stage, it is simply not obvious from the face of the Amended Complaint that SUNY RF's breach of fiduciary duty claims are time-barred.

Finally, Defendants argue that the breach of fiduciary duty claim is "duplicative" of the contract claims. (Dkt. No. 96-16, at 25-26). "In New York, '[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.'" *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) (quoting *Robin Bay Assocs., LLC v. Merrill Lynch & Co.,* No. 07-cv-376, 2008 WL 2275902, at *3, 2008 U.S. Dist. LEXIS 43679, at *8 (S.D.N.Y. June 3, 2008)). Instead, a plaintiff must "set[ ] forth allegations that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from [their contracts] alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties." *Id.* (quoting *Brooks v. Key Trust Co. Nat. Ass'n*, 809 N.Y.S.2d 270, 272–273 (2006)). However, "[i]t is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (N.Y. App. Div. 1987). Further, a provision in a contract stating that the contract "constitutes the entire agreement" between the parties is "not dispositive of the absence of a fiduciary duty[.]" *See Albany Molecular Rsch., Inc. v. Schloemer*, No.10-cv-210, 2010 WL 5168890, at *5, 2010 U.S. Dist. LEXIS 132007, at *13-14 (N.D.N.Y. Dec. 14, 2010). *Compare id.* (finding that provision

of agreement indicating that "no obligation of any kind relating thereto is assumed by or implied against either party hereto except those obligations stated herein" limited the value of the agreement in suggesting such a duty existed) *with Frydman & Co. v. Credit Suisse First Bos. Corp.*, 708 N.Y.S.2d 77, 79 (N.Y. App. Div. 2000) (finding that clause of parties' agreement "providing that legal obligations would not arise 'by virtue of this agreement' except as specifically agreed to therein or in other written agreements" did not preclude the finding of a fiduciary duty).

Here, SUNY RF has alleged that there was a relationship of confidence and trust based on conduct prior to the parties' 2015 and 2017 RAs, and that Inpria officers and employees separately conveyed to Dr. Brainard and his research team that the relationship was "based on mutual trust" and "fair and equitable all around[.]" (Dkt. No. 86, at 415). SUNY RF claims that Inpria CEO Grenville "specifically requested" that Dr. Brainard not "disclose any MORE research and inventions with non-Inpria members of industry so that such research and inventions could be developed jointly by Inpria and SUNY RF." (*Id.*). There is no express provision of the 2015 or 2017 RAs that that requires such loyalty on the part of Inpria or SUNY RF—i.e., that any inventions should be developed jointly, and not with a third party.

SUNY RF claims that Inpria breached its fiduciary duties of care, honesty, good faith, loyalty, candor and disclosure by, for example, "failing to permit SUNY RF to participate in the prosecution of the Challenged Patents and their continuations," by "solicitation of SUNY RF's customers," and by "usurpation of SUNY RF's business opportunities." (*Id.* at 416-17).[17] SUNY

---

[17] Many of the responsibilities SUNY RF alleges in the Amended Complaint as arising from the parties' alleged fiduciary relationship—for example, a duty to notify SUNY RF that Inpria used its confidential information to produce the Challenged Patents—*are* potentially duplicative of the 2015 and 2017 RAs, because they may be "derived directly and exclusively" from the parties' contractual relationships. *See Ellington*, 837 F. Supp. 2d at 196 ("Here, the claim that SPS's self-dealing and concealment breached its fiduciary duties simply restates, in nearly identical words, the breach of contract claim . . . Because any fiduciary duty here would be derived directly and exclusively from SPS's

RF alleges that, despite Inpria's request to Dr. Brainard not to disclose his research to other industry actors so that Inpria and SUNY RF could jointly develop their project, Inpria failed to alert SUNY RF when Inpria allegedly decided "to use, license, assign, enforce, and otherwise commercially exploit . . . patentable inventions, confidential information, research reports, inventions, or other intellectual property[.]" (*Id.* at 417). SUNY RF alleges that it "depended" on Inpria "from their direction of a research and development venture in which SUNY RF had a continuing financial interest and Inpria sought to commercialize and exploit," (*id.* at 414), but that Inpria nevertheless used SUNY RF's confidential information, patentable inventions, or other intellectual property "to compete against SUNY RF in the licensing of such intellectual property," (*id.* at 417). Again, at this early stage, the Court will not dismiss SUNY RF's fiduciary claim as duplicative, because SUNY RF has plausibly alleged fiduciary duties independent of Inpria's contractual duties. *See Ellington*, 837 F. Supp. 2d at 196; *see also St. John's*, 757 F. Supp. 2d at 168 (finding fiduciary relationship where defendants "were entrusted" with plaintiff's "resources and the autonomy and discretion to use those resources, because they possessed the special knowledge and expertise required to exploit those resources through useful research that might result in patentable discoveries").

### 3. Conversion

SUNY RF alleges in claims 289 through 314 that it has a "possessory and/or ownership right or interest" in each of the Challenged Patents, "including in the Ribbon Copy or Original Letters Patent and all other official United States Patent and Trademark Office records." (Dkt. No. 86, at 417-450). SUNY RF alleges that Inpria has "wrongfully exercised dominion" over the

---

contractual relationship with [the plaintiffs], their claims are redundant under New York law." (internal quotations and alterations omitted)). These obligations may not properly form the basis for a claim for a breach of fiduciary duty.

Challenged Patents, and that JSR has "separately and independently" exercised dominion over each of the Challenged Patents, such as by offering the patents as security for a bank loan to consummate its acquisition by JIC. (*See, e.g., id.* at 418).

Defendants urge the court to dismiss all twenty-six of SUNY RF's conversion claims. (*See* Dkt. No. 96-16, at 26-29). Defendants argue that the cause of action for conversion is inappropriate because "there are no viable allegations of misappropriation of any tangible property in connection with the intangible patent rights in dispute." (*Id.* at 26). Defendants further argue that the conversion claims are preempted by federal patent law, (*id.* at 27-28), that the 2015 and 2017 RAs bar the conversion claims, (*id.* at 28-29), and that the claims are time-barred, (*id.* at 29).

SUNY RF disagrees, arguing that "Defendants are wrong that patents cannot be converted as a matter of law[.]" (Dkt. No. 101, at 28). SUNY RF notes that its claims are for ownership, not inventorship, (*id.* at 29), that the 2015 and 2017 RAs do not cover the dispute in issue (and there is a dispute as to the existence of a contract between SUNY RF and JSR), (*id.* at 30), and that all of their conversion claims arose within the three-year statute of limitations, (*id.* at 31-32).

"[A] state law claim that either seeks 'patent-like' protections not provided by federal patent law, or turns on a determination of inventorship, is preempted by federal patent law." *Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 160 (E.D.N.Y. 2016). However, the Federal Circuit has held that, while "the field of federal patent law preempts any state law that purports to define rights based on inventorship[,]" "a claim arises under the patent laws only if the inventorship issue is essential to the resolution of the claim." *HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.*, 600 F.3d 1347, 1353-54 (Fed. Cir. 2010) (internal quotations omitted), *as*

*amended on reh'g in part* (June 14, 2010). "Moreover, the appearance of 'an alternative, non-patent theory' which may entitle the plaintiffs to their requested relief compels the conclusion that the cause of action does not arise under the patent laws.'" *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 813 (1988)) (holding that, under California law, patent law was not essential to plaintiffs' cause of action for conversion).

"In New York, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *St. John's,* 757 F. Supp. 2d at 177 (quoting *State of New York v. Seventh Regiment Fund, Inc.*, 746 N.Y.S.2d 637, 645 (N.Y. App. Div. 2002)). "The two elements of conversion are '(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'" *Id.* (quoting *Colavito v. New York Organ Donor Network, Inc.*, 827 N.Y.S.2d 96, 100 (N.Y. App. Div. 2006)). "The statute of limitations for a conversion claim is three years[,]" which "begins to run when the conversion occurs and not when the conversion is discovered or when plaintiff exercises diligence to discover it." *Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 702 (S.D.N.Y. 2002). However, "when the original possession of the property in question by a third party is lawful, 'a conversion claim does not occur until after [plaintiff demands property] and defendant[ ] refus[es] to return the property.'" *Id.* (quoting *D'Amico v. First Union National Bank*, 728 N.Y.S.2d 146, 151 (NY App. Div. 2001)).

"New York has made exceptions to the general principle that intangible property is not subject to a claim of conversion." *Harris v. Coleman*, 863 F. Supp. 2d 336, 344 (S.D.N.Y. 2012). "[T]here has been a growing trend towards recognizing certain types of intangible property as proper subjects of a conversion claim." *Id.* at 345. "[I]ntangible property may be subject to conversion when represented by a tangible manifestation, such as an electronic or paper record."

41

*Id.* "[T]he PTO's records represent a manifestation of the intangible intellectual property in much the same way that an electronic record of stock ownership represents a manifestation of who owns the stock." *Id.* "Therefore, intangible property rights, manifested by a patent assignment, can support a conversion claim." *Id.* (declining motion to dismiss counterclaim for conversion of the patent assignment); *cf. Arcadia Biosciences*, 356 F. Supp. 3d at 404 (dismissing the plaintiff's claim for conversion of its intellectual property because there was no allegation that a paper or electronic record of plaintiff's ownership "was in some way misappropriated by defendants"). "To state a claim for conversion, [a plaintiff] must allege that they have legal possession or an immediate superior right of possession to the patent assignment." *Harris*, 863 F. Supp. 2d at 344.

However, "New York law is clear in barring claims for conversion where damages are merely sought for breach of contract." *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, 148 F. Supp. 2d 321, 328 (S.D.N.Y. 2001). "For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately actionable." *Id.; see also In re JMK Constr. Grp., Ltd.*, 502 B.R. 396, 414 (Bankr. S.D.N.Y. 2013) ("Thus, '[a] plaintiff must allege acts that are unlawful or wrongful, rather than mere violations of contractual rights, to state a claim for conversion.'" (quoting *Calcutti v. SBU, Inc.*, 223 F. Supp. 2d 517, 523 (S.D.N.Y. 2002))). And a conversion claim is not necessarily duplicative of a breach of contract claim if "success on the conversion claim may entitle [a plaintiff] to special damages." *St. John's*, 757 F. Supp. 2d at 178. "Punitive damages 'may be recovered for an act of conversion where the circumstances establish that the conversion was accomplished by malice or reckless or willful disregard of the plaintiff's right.'" *Id.* (quoting

42

*Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*, 435 N.Y.S.2d 438, 441 (N.Y. Sup. Ct. 1980)).

Finally, while "claims arising" from "a valid agreement [that] governs the subject matter of a dispute between parties" are generally "contractual," that principle does not apply "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue[.]" *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (quoting *Am. Tel. & Util. Consultants v. Beth Israel Med. Ctr.*, 763 N.Y.S.2d 466, 466 (N.Y. App. Div. 2003)).

Here, SUNY RF has alleged that it has possessory and/or ownership rights in the "Ribbon Copy or Original Letters Patent[.]" (*See, e.g.,* Dkt. No. 86, at 418).  Under the terms of the 2015 and 2017 RAs, SUNY RF was to "hold title" or "joint title" to specific intellectual property rights "generated, conceived or reduced to practice during the conduct of work" under the agreements. (*See* Dkt. Nos. 86-2, at 4-6, 86-6, at 4-6). However, SUNY RF alleges that Defendants "have made and are continuing to make the unauthorized assumption and exercise of the right of ownership over the" Challenged Patents. (*See, e.g.*, Dkt. No. 86, at 418). *See also Harris*, 863 F. Supp. 2d at 344. ("To state a claim for conversion, [a plaintiff] must allege that they have legal possession or an immediate superior right of possession to the patent assignment.").

Defendants contend that "every patent inventorship claim could be re-pleaded as a conversion claim" if "possession of a Ribbon Copy were sufficient to allege conversion[.]" (Dkt. No. 104, at 10-11). But Defendant ignores the distinction between patent *inventorship* and patent *ownership*: "[i]t is elementary that inventorship and ownership are separate issues[.]" *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1352 (Fed. Cir. 2020) (quoting *Beech*

*Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). "[A]nd while conception is

the touchstone of inventorship, ownership operates based on contract or law[.]" *Id.*

("Corporations are not inventors, but they derive ownership rights through contracts, usually

with employees, or provisions of law. Thus, while Hamamatsu employees may be co-inventors,

and their rights transferred to their employer, Hamamatsu, Hamamatsu is the contracting party in

the NDA, and the NDA provides that ownership of patents arising from confidential information

exchanged under the agreement is claimed by the disclosing party."). In short, a party may claim

inventorship of a patent while another entity holds lawful title to it. *See also HIF Bio, Inc.*, 600

F.3d at 1355 ("[P]atent law is not essential to plaintiffs' remaining causes of action for []

conversion, . . . because each cause of action could be resolved without reliance on the patent

laws.").

Defendants further contend that the existence of the 2015 and 2017 RAs between the

parties bars the conversion claim, because SUNY RF has alleged that these agreements "govern

the subject of the dispute." (Dkt. No. 96-16, at 28-29). As to the contract between SUNY RF and

Inpria, Defendants do not explain what provisions of the RAs govern the subject of this dispute,

and in any event, SUNY RF's success on its conversion claims may entitle it to punitive

damages not available on a breach of contract theory. *See St. John's*, 757 F. Supp. 2d at 178.

SUNY RF has alleged that Defendants acted with "malice or reckless or willful disregard" of

SUNY RF's rights, (*see e.g.* Dkt. No. 86, at 418-19), which could permit SUNY RF to recover

punitive damages, *see St. John's*, 757 F. Supp. 2d at 178.[18] SUNY RF sufficiently alleges facts

supporting its assertion that Inpria acted with malice, recklessness, or willful disregard for its

---

[18] Defendants assert that SUNY RF has failed to allege "fraudulent assignment," and suggests that such an allegation
is a "requirement" to state its conversion claim. (Dkt. No. 104, at 10). But a party need not plead fraudulent assignment
to establish a conversion claim in a patent case. *See, e.g., St. John's*, 757 F. Supp. 2d at 178-79.

rights, particularly because it is reasonable to infer that Inpria knew SUNY RF had rights to the Challenged Patents before and during the terms of the 2015 and 2017 RAs by virtue of SUNY RF's ongoing confidential disclosures to Inpria. (*See, e.g.*, Dkt. No. 86, at 52, 54-55, 57-59, 179-80). Despite that knowledge, Inpria allegedly failed to inform SUNY RF of its intention to use any of its alleged intellectual property, and even assigned certain of the Challenged Patents to Tokyo Electron. (*See id.* at 100, 114, 249); *see also St. John's*, 757 F. Supp. 2d at 178–79 ("It is reasonable to infer from the facts alleged in the Complaint that Bolton and Spireas knew of Plaintiff's rights and deliberately and intentionally interfered with them. . . [T]he factual essence of Plaintiff's action is that Bolton and Spireas knew that St. John's had rights to the assignment of the Liquisolid Patents and had a duty to inform St. John's of the value of their research and the resulting patents. In spite of this duty and Plaintiff's rights, Bolton and Spireas deliberately failed to inform St. John's of the existence or value of their inventions [] and resulting royalties, and took steps to prevent St. John's from asserting its rights, including by assigning the Liquisolid Patents to Hygrosol. Accordingly, Plaintiff has stated a claim to punitive damages against Bolton and Spireas and has stated a claim for conversion against Bolton and Spireas" (internal citation omitted)).

With respect to the conversion claims against JSR, Defendants' argument that SUNY RF's conversion claims are duplicative of its contract claims is without merit. Defendants themselves dispute the existence of a contract between SUNY RF and JSR. (*See*, *e.g.*, Dkt. No. 95 at 178). If there is no contract between SUNY RF and JSR, there is no agreement governing the parties' dispute, and there is no contract claim that could preclude the conversion claims against JSR. And if SUNY RF proves that there *was* a valid contract between itself and JSR, SUNY RF's allegations, if proven true, plausibly support the claim that JSR's acts were

wrongful. SUNY RF alleges that JSR "knew or should have known" that Inpria had "agreed not

to use and had no rights in Foundation Inventions" and that SUNY RF had a right to ownership

in those inventions, and nonetheless gained access to those inventions from Inpria. (Dkt. No. 86,

at 243) "[E]ven before JSR acquired Inpria as a wholly-owned subsidiary, and even before JSR

received actual notice of SUNY RF's rights from SUNY RF in November 2023, JSR was a

shareholder in the then-closely held Inpria and JSR's CEO Eric Johnson sat on the board of

directors of Inpria during the relevant time period." (*Id.*). Despite that knowledge, SUNY RF

alleges that JSR pledged Inpria's corporate assets, including Foundation Inventions in which

SUNY RF had a right to ownership, as security for a bank loan in order to "consummate JIC's

tender offer and acquisition" of JSR. (*Id.* at 451). These allegations create a plausible inference

that JSR interfered with SUNY RF's property "in derogation of" SUNY RF's rights. *See St.

John's*, 757 F. Supp. 2d at 178. Therefore, the conversion claims are not preempted by federal

law, and there are sufficient factual allegations to allow a plausible inference that they are not

barred by the existence of a contract between the parties.

Finally, Defendants argue that the conversion claims are all time-barred. (Dkt. No. 96-16,

at 29). Again, Defendants argue that the "earliest priority date with respect to all 26 patents in

dispute was more than three years before the parties entered into the Tolling Agreement." (*Id.*).

But as SUNY RF notes, SUNY RF does not allege that Defendants "wrongfully converted

property in filing patent applications[,]" but rather that Defendants converted their property when

they "unlawfully transferred to others and/or refused to return to [SUNY RF] ownership of the

Challenged Patents as manifested in the official PTO records[.]" (Dkt. No. 101, at 31). And in

any event, Defendants argue that the conversion claims are out of time solely based on the

patents' alleged earliest priority date, and the Court has already determined that this date is not a

clear indicator of either party's legal rights under the circumstances, *See* discussion *supra* Section III.B.1.b.

Defendants again cite case law indicating that the conversion claims accrued when the patents were filed, (*see* Dkt. No. 104, at 12), but (1) Defendants argue that the conversion claims accrued on the Challenged Patents' "earliest priority date," not on their date of filing, (Dkt. No. 96-16, at 29), (2) none of the case law Defendants cite support the proposition SUNY RF's conversion claims accrued on the "earliest priority date," and (3) as noted above, according to SUNY RF, five of the Challenged Patents were filed as recently as 2022, (*see* Dkt. No. 86-1), which is within the three-year limitations period.

Defendants also do not address whether the date(s) on which Plaintiff alleges its conversion claim accrued—the date(s) upon which Defendants "unlawfully transferred to others and/or refused to return to Plaintiff ownership of the Challenged Patents as manifested in the official PTO records"—may be timely. (*See* Dkt. No. 101, at 31). Nor is it clear from the face of the research agreements when the parties intended SUNY RF's ownership rights to accrue. (*See* Dkt. No. 86-2, at 4 ("[SUNY RF] shall hold title to all Intellectual Property Rights which are generated, conceived, or reduced to practice during the conduct of work under this Agreement . . . ")). *C.f. St. John's*, 757 F. Supp. 2d at 179-80 ("From the allegations in the Complaint, Bolton's and Spireas's initial ownership and possession of the Liquisolid Patents was not wrongful. Under federal law a patent is issued to the inventors, who are the owners of the patent in the first instance, unless and until they assign it. St. John's allegations as to the patent-assignment terms in the Agreements—the source of Plaintiff's right of possession—demonstrate that the parties contemplated that St. John's would obtain ownership of the Liquisolid Patents only after Bolton and Spireas performed their contractual duty to assign them to St. John's."). *See also Marsh v.*

*Nichols, Shepherd & Co.*, 128 U.S. 605, 612 (1888) ("Until the patent is issued, there is no property right in it; that is, no such right as the inventor can enforce. Until then there is no power over its use, which is one of the elements of a right of property in anything capable of ownership."). As such, the Court declines to dismiss SUNY RF's conversion claims as untimely, and Defendants' motion to dismiss is denied with respect to those claims.

### 4.    Unjust Enrichment

The Amended Complaint pleads a total of five unjust enrichment claims. Specifically, SUNY RF alleges two unjust enrichment claims against JSR in the alternative to its breach of contract claims, "in the event an enforceable contract is determined not to exist between SUNY RF and JSR as the successor, assign, and/or heir of Inpria[,]" (Dkt. No. 86, at 238-40 (claim 4 alleging "Unjust Enrichment (Use of Prior Project IP)" against JSR); 242-44 (claim 6 alleging "Unjust Enrichment (Use of Foundation Inventions)" against JSR)); two unjust enrichment claims alleging Inpria and JSR wrongfully benefitted from their misrepresentations that they were "the sole owners of the then-existing Challenged Patents[,]" (*id.* at 407-409 (claim 285 alleging "Unjust Enrichment (False Exclusivity)" against Inpria), 409-011 (claim 286 alleging "Unjust Enrichment (False Exclusivity)" against JSR)); and one unjust enrichment claim against Inpria for wrongfully benefitting from SUNY RF's "intellectual property and assistance[.]" (*id.* at 411-414 (claim 287)).

Defendants ask the Court to dismiss all of SUNY RF's claims for unjust enrichment, because they are (1) preempted by federal patent law and (2) barred by the existence of the 2015 and 2017 RAs. (Dkt. No. 96-16, at 30-32). SUNY RF says the preemption argument fails for the same reasons it failed as to SUNY RF's conversion claims, and that the Defendants' motion ignores that (1) two of the unjust enrichment claims were pleaded in the alternative, and (2) none

of the other unjust enrichment allegations are even mentioned in Defendants' motion. (Dkt. No. 101, at 32-34).

"To make out a claim for unjust enrichment, a plaintiff must establish, '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *St. John's*, 757 F. Supp. 2d at 182 (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N. J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006). "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Id.* (quoting *Paramount Film Distrib. Corp. v. State of New York*, 334 N.Y.S.2d 388, 393 (1972)). "Unjust enrichment is a quasi-contract claim viable only in the absence of an enforceable agreement between the parties governing the subject matter of the dispute." *DeCoursey v. Murad, LLC*, 673 F. Supp. 3d 194, 219 (N.D.N.Y. 2023).

However, an unjust enrichment claim may survive a motion to dismiss where "the parties disputed the enforceability of an alleged contract." *Id.* Further, where there is a question as to the "meaning and effect" of a contract, and "whether conduct that has yet to be established" falls within its scope, dismissal on the pleadings may be premature. *See St. John's*, 757 F. Supp. 2d at 183-84 ("[T]he threshold question is whether an enforceable contract exists that governs the subject matter underlying the unjust enrichment claim. Though Defendants may well establish that the conduct underlying these claims should be governed by the Agreements, Defendants may also establish that no valid contracts exist or that the breaches alleged by Plaintiff were not breaches of duties governed by the contracts."). "Even if the Agreements are enforceable, the court must still interpret them to determine whether the unjust enrichment claims arise out of the same subject matter." *Id.* at 184.

First, Defendants' assertion that the unjust enrichment claims are preempted by patent law fails for all the reasons discussed above with respect to conversion. *See* discussion *supra*, Section III.A.2; *see also Krauser v. BioHorizons, Inc.*, 753 F.3d 1263, 1269 (Fed. Cir. 2014) ("A claim of *ownership* does not necessarily require consideration of patent law *inventorship*. A state law contract claim or quantum meruit claim may entitle Krauser to royalties from the Dental Implant System even if he is not listed as an 'inventor' on the face of the patent.").

Next, the Court notes that two of SUNY RF's claims, numbers 4 and 6, are pled against JSR "in the event an enforceable contract is determined not to exist between SUNY RF and JSR," and in the alternative to its breach of contract claims. (Dkt. No. 86, at 238, 242). Defendants argue that "New York courts permit a plaintiff to plead unjust enrichment in the alternative to breach of contract only when there is a dispute as to the enforceability or validity of the contract at issue." (Dkt. No. 96-16, at 31). Because the parties "agree the Research Agreements are valid and enforceable contracts," say Defendants, these unjust enrichment claims should be dismissed. (*Id.* at 32). But Defendants apparently overlook the fact that claims 4 and 6 are pled *only* against JSR, and Defendants themselves argue in their motion that JSR is not a party to the 2015 and 2017 RAs. (*Id.* at 34). There is clearly a dispute as to the enforceability of either Research Agreement against JSR, because SUNY RF asserts that the agreements are binding upon JSR. (*See, e.g.,* Dkt. No. 86, at 236). If JSR establishes the RAs afford SUNY RF no relief as to JSR, SUNY RF's unjust enrichment may be viable. *See Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 419 (N.D.N.Y. 2020) (denying motion for judgment on the pleadings, explaining that "[i]f defendant successfully proves that there is no valid, enforceable contractual provision that affords plaintiffs relief, then their unjust enrichment claim

would be viable regardless of their erstwhile breach of contract claims"). Accordingly, Defendants' motion as to claims 4 and 6 is denied.

In claim 285 against Inpria for "False Exclusivity," SUNY RF alleges that Inpria "wrongfully benefited from claiming false exclusivity over and sole ownership of the disputed intellectual property[.]" (Dkt. No. 86, at 407). Specifically, SUNY RF claims that Inpria obtained $31 million in Series C funding in reliance on its public "misrepresentation that it was the sole owner of the rights to the then-existing Challenged Patents," and that JSR's purchase of Inpria for $514 million was also made in such reliance. (*Id.* at 407-408).

Claim 286 is against JSR and also for "False Exclusivity," and asserts that JSR wrongfully benefited from its public misrepresentation that Defendants are the sole owners of the Challenged Patents "in order to increase the value of JSR" and increase its stock price, market share, and market cap. (Dkt. No. 86, at 409-10). SUNY RF also alleges that JIC's acquisition of JSR for $6.4 billion was "made in reliance on JSR's misrepresentation" that Defendants were the sole owners of the Challenged Patents. (*Id.* at 410).

Finally, in claim 287, against Inpria for "Intellectual Property and Assistance," SUNY RF alleges it "conferred a benefit on Inpria by providing Inpria with limited rights to access and use valuable intellectual property, including Prior Project IP and Joint IP," (*id.* at 412), "valuable assistance through the provision of personnel, facilities, and research assistance[,]" and that Inpria and JSR were "unjustly enriched" upon assigning certain of the Challenged Patents and applications to Tokyo Electron in 2023, (*id.* at 413). SUNY RF also claims that Inpria used the "intellectual property and assistance to obtain a head start on other players and competitors in the global photoresist market and industry." (*Id.* at 413).

Defendants argue that SUNY RF's unjust enrichment claims "merely recast" their contract claims, but only point to claims 4 and 6—the claims specifically pled in the alternative to a breach of contract theory—in support of this proposition. (*See* Dkt. No. 96-16, at 31). Defendants do not explain how their argument applies to claims 285, 286, and 287, nor do they explain how the alleged breaches were "breaches of duties governed by the contracts." *See St. John's*, 757 F. Supp. 2d at 184-85. Without any guidance as to how these claims "recast" SUNY RF's breach of contract claims, and because Defendants dispute the existence of a contract between SUNY RF and JSR, the Court will not dismiss claims 285, 286, or 287.[19] *See St. John's*, 757 F. Supp. 2d at 183 ("In this case, Defendants' arguments beg the question of what performance the Agreements required of the Defendants. Only after determining whether, and to what extent, the Agreements governed the parties' conduct in relation to the alleged inventions and patents can the court determine whether the claims are duplicative. However, the court is in no position to finally determine the meaning and effect of contracts the parties have not presented to it. Nor can the court determine whether conduct that has yet to be established falls within the scope of the alleged contracts."). Accordingly, Defendants' motion for judgment on the pleadings dismissing SUNY RF's unjust enrichment claims is denied.

### 5.     Declaratory Judgment

Defendants also urge the Court to dismiss SUNY RF's declaratory judgment claims. (Dkt. No. 96-16, at 32). As to the U.S. patents, Defendants argue that claim is duplicative of SUNY RF's claims for correction of inventorship. (*Id.* at 32-33). And as to the foreign patents,

---

[19] The Court notes, however, that several of the arguments in claim 287 regarding SUNY RF's provision of its intellectual property and assistance *do* seem to fall squarely within the terms of the 2015 and 2017 RAs. Nevertheless, without argument from the Defendants as to the scope of these agreements, the Court will go no further in its analysis.

Defendants claim that this Court lacks jurisdiction to make such a declaration of ownership. (*Id.* at 33-34). The Court addresses each issue in turn.

### a.    U.S. Patents

SUNY RF seeks "a judgment that SUNY RF is the sole owner of the Challenged Patents or, in the alternative, a co-owner of the Challenged Patents." (Dkt. No. 86, at 236). Defendants argue that this claim is "entirely duplicative of Plaintiff's 270 claims for correction of inventorship[.]" (Dkt. No. 96-16, at 32). SUNY RF disagrees. (Dkt. No. 101, at 10-11).

As the Court has already addressed above, "[i]t is elementary that inventorship and ownership are separate issues," and "ownership operates based on contract or law." *SiOnyx*, 981 F.3d at 1352 (quoting *Beech Aircraft Corp.*, 990 F.2d at 1248. "Corporations are not inventors, but they derive ownership rights through contracts, usually with employees, or provisions of law." *Id.*; *see also Intellisoft, Ltd. v. Acer Am. Corp.*, 955 F.3d 927, 932 (Fed. Cir. 2020) (vacating district court's judgment and remanding with instructions to remand to state court for lack of jurisdiction, because "ownership under state law did not require proof of patent inventorship").

Defendants argue that SUNY RF's request for a declaratory ruling that SUNY RF is the sole or co-owner of the Challenged Patents is "identical" to the ruling SUNY RF seeks in connection with its correction of inventorship claims: "a ruling that [SUNY RF]'s scientists and students are the sole or co-inventors of the patents in dispute." (Dkt. No. 96-16, at 32 (citing Dkt. No. 86 at 260–407)). Defendants cite cases that stand for the general proposition that "declaratory judgment claims that duplicate substantive claims should be dismissed," (Dkt. No. 96-16, at 32 (quoting *Beach v. HSBC Bank USA, N.A.*, No. 17-cv-5153, 2018 WL 3996931, at *7, 2018 U.S. Dist. LEXIS 141887, at *19 (S.D.N.Y. Aug. 21, 2018)), without citing to any case

discussing whether declaratory judgment claims regarding patent ownership may be duplicative of substantive claims regarding patent inventorship. Further, Defendants fail to address SUNY RF's allegations that its ownership claims are based on contracts, namely an *assignment* by the inventor to SUNY RF, or pursuant to the terms of the RAs, (Dkt. No. 86, at 234 (alleging ownership "by virtue of fact that the true SUNY RF inventor(s) . . . assigned all right, title, and interest in the Challenged Patents to SUNY RF" or "pursuant to the terms of the 2015 and 2017 Research Agreements")). Thus, as the Amended Complaint plausibly alleges patent ownership claims stemming from a contractual agreement, and not solely due to inventorship, the Court finds Defendants' argument of duplicative claims is without merit.

In their Reply Brief, Defendants assert for the first time that the declaratory judgment claim is improperly duplicative of the breach of contract claims, but again, they fail to engage with the facts alleged in the Amended Complaint or to cite to a case involving intellectual property rights to support this assertion. (*See* Dkt. No. 104, at 13-14). Further, as this argument was raised for the first time in a reply brief, the Court declines to consider it at this time. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006) ("[W]e generally do not consider arguments that are raised for the first time in a reply brief."). Accordingly, Defendants' motion to dismiss SUNY RF's declaratory judgment claim with respect to U.S. Patents on the basis of that they are duplicative is denied.

### b.     Foreign Patents

In claim 2, SUNY RF seeks a judgment that it is "the sole owner of the foreign counterparts to the [26] Challenged Patents, or, in the alternative, a co-owner of the foreign counterparts to the [26] Challenged Patents." (Dkt. No. 86, at 236). Defendants move to dismiss this claim on the ground that "this Court lacks jurisdiction." (Dkt. No. 96-16, at 33–34). SUNY

RF opposes Defendants' motion, asserting, *inter alia*, that its claim for declaratory relief centers on ownership claim and does not implicate the same "comity concerns" as "foreign infringement claims." (Dkt. No. 101, at 11-12 (additional quotation marks omitted)).

Defendants rely on *Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007), in support of their assertion that the court should decline jurisdiction in disputes concerning foreign patents. (*See* Dkt. No. 96-16, at 33). But *Voda* involved a foreign patent *infringement* claim, not a patent *ownership* claim, and *Voda* also involved the federal court's discretionary exercise of supplemental jurisdiction under 28 U.S.C. § 1367, not diversity jurisdiction. 476 F.3d at 892-93. Indeed, "it is well established that courts have authority to compel parties properly before them to transfer ownership of foreign patents, just as they would any other equitable remedy." *SiOnyx*, 981 F.3d at 1353-54 (reversing district court for declining to grant ownership claim over foreign patent where denial was premised in part on "uncertainty regarding the court's jurisdiction to grant ownership of foreign patents"). Here, SUNY RF is seeking a declaration of ownership— not inventorship—regarding the foreign Challenged Patents, and the parties do not appear to dispute that the Court has diversity jurisdiction. As such, Defendants' motion for judgment on the pleadings dismissing the declaratory judgment claim with respect to the foreign counterparts of the Challenged Patents is denied.[20]

### 6.    Claims Against JSR

Finally, the Court addresses Defendants' argument that JSR must be dismissed from the case. (Dkt. No. 96-16, 34-39). Defendants assert that SUNY RF insufficiently pleads its successor and alter-ego liability theories. (*Id.* at 34). SUNY RF argues that Defendants' motion

---

[20] In their Reply Brief, Defendants again argue for the first time that a declaratory judgment of ownership of the foreign patents is improperly duplicative of SUNY RF's breach of contract claims. (Dkt. No. 104, at 14). For all the reasons discussed above, this argument also fails. *See* discussion *supra* Section III.B.5.a.

"jumps directly over JSR's *direct* liability and merely argues that JSR is not subject to 'vicarious liability.'" (Dkt. No. 101, at 34). JSR's direct liability has been addressed above. *See* discussions *supra* Sections III.B.1.a.; III.B.3; III.B.4. The Court will now consider SUNY RF's arguments with respect to JSR's successor and alter-ego liability.

### a.    Successor Liability

"Separate and independent from its own liability for its own acts as described throughout this Complaint," SUNY RF alleges that "JSR also is separately liable for Inpria's contractual and tort liabilities because JSR has expressly and/or impliedly assumed Inpria's liabilities." (Dkt. No. 86, at 450). SUNY RF further alleges that "JSR was aware of and assumed Inpria's liabilities when it acquired Inpria as a wholly owned subsidiary on October 29, 2021," and that, "[a]t the time of the acquisition and thereafter, JSR has expressly and/or impliedly assumed, consented to, assented to be liable for JSR's contractual and tort liabilities including, on information and belief, in the agreements governing the Inpria-JSR acquisition and separate indemnification agreement(s) governing the claims of this action or otherwise." (*Id.* at 450-51). "Such agreements and negotiations are non-public and thus must be obtained through discovery." (*Id.* at 451). Defendant asserts that SUNY RF's successor liability fails for insufficient pleading. (Dkt. No. 96-16, at 34-35).

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). "Both New York law and traditional common law, however, recognize certain exceptions to this rule." *Id.* "In general, successor liability exists when (1) there has been an express or implied agreement to assume the other company's debts and obligations, (2) the transaction was fraudulent, (3) there has been a de facto

merger or consolidation of the companies, or (4) the purchasing company is a mere continuation

of the selling company." *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 729 (S.D.N.Y. 2007),

*aff'd sub nom. Bondi v. Cap. & Fin. Asset Mgmt. S.A.*, 535 F.3d 87 (2d Cir. 2008).

SUNY RF argues that "JSR is liable for Inpria's acts under an express or implied assent

theory." (Dkt. No. 101, at 34). Defendants insist that SUNY RF "alleges no viable facts or details

to support" that theory, "other than JSR's mere acquisition of Inpria shares." (Dkt. No. 96-16, at

35). But as noted above, SUNY RF has not simply alleged JSR's acquisition of Inpria's shares;

SUNY RF has alleged that JSR agreed to assume Inpria's obligations as part of non-public

"agreements governing the Inpria-JSR acquisition and separate indemnification agreement(s)

governing the claims of this action or otherwise." (*See, e.g.*, Dkt. No. 86, at 451). This is

sufficient, at this stage in the litigation, to plausibly allege that JSR is separately liable for

Inpria's contractual and tort liabilities as Inpria's successor on an express or implied assent

theory. *See* discussion *supra* Section III.B.1.a.

### b.    Alter Ego Theory

SUNY RF also alleges that, "[s]eparate and independent from its own liability for its own

acts as described throughout this Complaint, JSR also is separately liable for Inpria's contractual

and tort liabilities as its alter ego and/or through piercing the corporate veil, including because

Inpria is dominated and controlled by JSR for JSR's own purposes and because JSR has used

Inpria for the transaction of JSR's personal business as opposed to Inpria's business." (Dkt. No.

86, at 451). JSR claims that SUNY RF "has not pleaded sufficient facts establishing that JSR is

Inpria's alter ego." (Dkt. No. 96-16, at 36-39).

"The doctrine of alter ego or 'piercing the corporate veil' liability permits the owner of a

corporation or a corporate affiliate, under certain limited circumstances, to be held liable for the

corporation's obligations." *Xiotech Corp. v. Express Data Prods. Corp.*, 11 F. Supp. 3d 225, 236 (N.D.N.Y. 2014). "In order to pierce the corporate veil, a party must establish that '(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury.'" *Id.* (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y.2004)).

### i.    Domination

First, SUNY RF must establish that JSR "exercised complete domination" of Inpria. *See Xiotech* 11 F. Supp. 3d at 236. Courts in New York consider the following factors to determine whether the requisite domination is present:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Xiotech*, 11 F. Supp. 3d 225, 236 (N.D.N.Y. 2014) (quoting *JSC Foreign*, 306 F. Supp. 2d at 486). "Courts are not required to find that every factor is present, and no one factor is dispositive." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018). While "purely conclusory allegations of alter-ego status will not survive a motion to dismiss," *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*, No. 1:06-cv-871, 2007 WL 951565, at *5, 2007 U.S. Dist. LEXIS 22097, at *17 (N.D.N.Y. Mar. 27, 2007), "plausible allegations of domination and control" can allow the claim to survive to discovery.

*Sphere Digital, LLC v. Armstrong*, 20-cv-4313, 2020 WL 6064156, at *6, 2020 U.S. Dist. LEXIS 190516, at *16–17 (S.D.N.Y. Oct. 14, 2020); *Robles v. Copstat Sec., Inc.*, No. 08-cv-9572, 2009 WL 4403188, at *2, 2009 U.S. Dist. LEXIS 112003, at *6-7 (S.D.N.Y. Dec. 2, 2009).

Defendants argue that SUNY RF "has not pled sufficient facts establishing that JSR is Inpria's alter ego." (Dkt. No. 96-16, at 36). Specifically, they assert that SUNY RF has "failed to sufficiently allege facts establishing either complete domination by JSR over Inpria, or that any such domination was used to commit a fraud or wrong" against SUNY RF. (*Id.*).

SUNY RF alleges that "JSR has comingled its assets with Inpria's and has exercised dominion and control over Inpria's assets in order to benefit JSR personally rather than Inpria." (Dkt. No. 86, at 451). As an example in support of this allegation, SUNY RF alleges that JSR pledged Inpria's corporate assets as security for a bank loan in order to "consummate JIC's tender offer and acquisition" of JSR. (*Id.*). Defendants argue that this allegation is erroneous and cite this Court's decision on SUNY RF's motion for a preliminary injunction, *Rsch. Found. for State Univ. of New York v. Inpria Corp.*, No. 24-cv-120, 2024 WL 1345511, at *5 n.4, 2024 U.S. Dist. LEXIS 57269, at *14 n.4 (N.D.N.Y. Mar. 29, 2024), to suggest that the Court has already rejected this argument, (Dkt. No. 96-16, at 37) ("The Court will recall Plaintiff made similarly erroneous allegations about this pledge at the preliminary injunction oral argument, which the Court rejected.").

But Defendants misrepresent this Court's words by altering a quote from its earlier decision to support their argument. On the motion for preliminary injunction, SUNY RF argued that the Court should "find irreparable harm based on JSR pledging its assets to a third party as collateral for a loan." *Inpria*, 2024 WL 1345511, at *5 n.4, 2024 U.S. Dist. LEXIS 57269, at *14

n.4. The Court was "unpersuaded," because SUNY RF had not "explained how pledging assets in connection with a tender offer is akin to transferring assets in any case or how the circumstances or mechanics of the JSR asset pledge present a non-speculative risk of any dissipation [] of assets in this case." *Id.* Defendants, however, quote the decision to say "Plaintiff 'has not explained how pledging assets in connection with a tender offer is akin to [commingling] assets.'" (Dkt. No. 96-16, at 37). "Transferring" and "commingling" are wholly dissimilar issues, and alter ego liability was not before the Court at that time. Notably, Defendants have not argued that pledging Inpria's assets in connection with a tender offer *is not* akin to commingling assets.

SUNY RF also alleges an "overlap in ownership, officers, directors, and personnel," *see Xiotech*, 11 F. Supp. 3d at 236, because Inpria and JSR "share officers, directors, and personnel[,]" and that JSR controls "other of Inpria's officers, directors, and management. (Dkt. No. 86, at 452). Specifically, SUNY RF alleges that "JSR's CEO Eric Johnson formerly sat on Inpria's board of directors," that "JSR has advertised job posting and elicited employees for Inpria, including an IT Site Lead at Inpria's Corvallis headquarters[,] and that JSR "terminat[ed] the employment of former Inpria CEO Andrew Grenville and other alleged named inventors." (*Id.*).

SUNY RF also alleges that Inpria and JSR share a "common office space," *see Xiotech*, 11 F. Supp. 3d at 236, "including Inpria's Corvallis headquarters, which JSR has held out as its own in public job postings and otherwise[,]" (Dkt. No. 86, at 452). JSR has also "required Inpria to refer to itself as a 'JSR Company' and to include JSR's marks on its materials, websites, and products." (*Id.*).

Further, SUNY RF plausibly alleges a lack of an arms-length relationship and/or that JSR used Inpria's property as if it were its own. *See Xiotech*, 11 F. Supp. 3d at 236. Specifically, SUNY RF alleges that "JSR's EUV metal oxide photoresist products are based on and/or incorporate Inpria technology," but "there has been no disclosure of any arm's length sales, assignments, or licenses to permit such practices," and JSR's website offers Inpria's products for sale. (*Id.* at 453). SUNY RF also asserts that JSR "exercises complete control over Inpria's manufacturing plant in Corvallis, Oregon and, on information and belief, uses it to research, develop, and manufacture JSR's metal photoresists." (*Id.* at 453).

With these allegations in mind, the Court concludes that SUNY RF has alleged sufficient facts to state a claim that JSR had complete domination over Inpria. *See Schwartz v. Sensei, LLC*, No. 17-cv-04124, 2020 WL 5817010, at *9, 2020 U.S. Dist. LEXIS 180641, at *27 (S.D.N.Y. Sept. 30, 2020) (finding domination where one defendant owned 80% of the company, actions taken by the company were commenced at the "sole discretion, and under the strict supervision and control of defendant, company was operated from a virtual office where that defendant was based, and plaintiff alleged defendant "siphoned money from the company in questionable ways"); *cf. Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 386 (S.D.N.Y. 2023) ("Because Plaintiffs' statements consist of conclusory allegations devoid of supporting factual detail, this case is distinguishable from others in which plaintiffs have put forth more specific allegations about domination and control.").

### ii.    Wrongdoing

As to the second element necessary to establish alter-ego liability, SUNY RF must show that JSR's domination of Inpria "was used to commit a fraud or wrong against [SUNY RF] which resulted in [SUNY RF]'s injury." *See Xiotech*, 11 F. Supp. 3d at 236. Defendants argue

that SUNY RF could not possibly establish any such connection, because SUNY RF's allegations "are premised on Inpria's improper use of [SUNY RF]'s alleged intellectual property," and "the earliest priority dates for each of these patents spans from 2010 to 2018[.]" (Dkt. No. 96-16, at 39). Because JSR did not acquire Inpria until 2021, argue Defendants, JSR could not have plausibly used its alleged control over Inpria to commit a fraud or other wrong on SUNY RF. (*Id.*).

But SUNY RF alleges wrongs that arose *after* JSR's acquisition of Inpria in 2021, such as for the commercialization, sale, and manufacture of products incorporating SUNY RF's IP, Inpria's refusal to correct ownership and inventorship of the Challenged Patents, and Inpria's assignment and licensing of the Challenged Patents. (Dkt. No. 101, at 37 (citing Dkt. No. 86, at 237-38, 245-46, 247-50, 253, 255-56, 258-59, 453-54)). And, in any event, the Court has already dispensed with Defendants' reliance on the Challenged Patents' "earliest priority dates." *See* discussion *infra* Section III.B.1.b. At this stage, the Court finds that SUNY RF has plausibly alleged its alter-ego theory of liability against JSR. Accordingly, Defendants' motion for judgment on the pleadings dismissing the claims against JSR is denied.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for partial judgment on the pleadings, (Dkt. No. 96), is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: <u>February 12, 2025</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge